UNITED STATES of America,
Appellee,

v.

Saul I. BIRNBAUM, Defendant-Appellant.

No. 428, Docket 28683.

United States Court of Appeals
Second Circuit.

Argued April 27, 1964.

Decided Oct. 13, 1964.

Mortimer Todel, Executive Asst. U. S. Atty. (Robert W. Morgenthau, U. S. Atty. for Southern District of New York, Bernard W. Nussbaum, John S. Martin, Jr., Andrew T. McEvoy, Jr., New York City, of counsel), for the United States of America.

David W. Peck, New York City (Hays, Sklar & Herzberg, Ben Herzberg, Leonard Schaitman, New York City, of counsel), for defendant-appellant.

Before LUMBARD, Chief Judge, and MOORE and SMITH, Circuit Judges.

MOORE, Circuit Judge:

Saul I. Birnbaum appeals from his conviction in the United States District Court for the Southern District of New York after a jury trial. He was found guilty of bribing Internal Revenue Agent Harold Simon (count three) and of conspiring with Simon and others to do so (count one). Simon was named as a co-defendant but before trial pleaded guilty to the counts in which he was named.

The indictment was in four counts. Count one charged in substance that co-defendant Birnbaum and Simon conspired with Alexander L. Guterma, Robert J. Eveleigh and Robert C. Leonhardt, named as co-conspirators but not as defendants, to violate 18 U.S.C.A. §§ 201,[1] 202,[2] and 26 U.S.C.A. § 7214,[3] in that as part of the conspiracy Simon would

1. Title 18, United States Code, Section 201:
   "*Offer to officer or other person*
   "Whoever promises, offers or gives any money or thing of value * * * to any officer or employee or person acting for or on behalf of the United States, * * * in any official function, * * * with intent to influence his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, * * * or with intent to influence him to commit * * *, or to collude in, or allow, any fraud * * * on the United States, or to induce him to do or omit to do any act in violation of his lawful duty, shall be fined not more than three times the amount of such money or value of such thing or imprisoned not more than three years, or both."

2. Title 18, United States Code, Section 202:
   "*Acceptance or solicitation by officer or other person*
   "Whoever, being an officer or employee of * * * the United States, * * * asks, accepts, or receives any money, or any check, * * * gratuity * * *, with intent to have his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place or trust or profit, influenced thereby, shall be fined not more than three

times the amount of such money or value of such thing or imprisoned not more than three years, or both; and shall forfeit his office or place and be disqualified from holding any office of honor, trust, or profit under the United States."

3. Title 26, United States Code, Section 7214:
   "*Offenses by officers and employees of the United States*
   "(a) *Unlawful acts of revenue officers or agents.—*
   "Any officer or employee of the United States acting in connection with any revenue law of the United States—
   "(1) who is guilty of an extortion or willful oppression under color of law; or
   "(2) who knowingly demands other or greater sums than are authorized by law, or receives any fee, compensation, or reward, except as by law prescribed, for the performance of any duty; or
   "(3) who with intent to defeat the application of any provision of this title fails to perform any of the duties of his office or employment; or
   "(4) who conspires or colludes with any other person to defraud the United States; or
   "(5) who knowingly makes opportunity for any person to defraud the United States; or
   "(6) who does or omits to do any act with intent to enable any other

receive from Birnbaum and the other conspirators greater sums than were authorized by law to induce him to corruptly examine the tax returns of Guterma and his wife, Leonhardt and his wife and of McGrath Securities Corporation. Count two, against Simon alone, charged that in April, 1957, he received a sum greater than authorized by law, namely, $10,000 and 5,000 shares of stock of Shawano Development Corporation for a determination favorable to the taxpayers of taxes owing by Guterma for 1955 and 1956 and by Leonhardt for 1954 through 1957, in violation of 26 U.S.C.A. § 7214(a) (2). Count three alleged that Birnbaum gave $10,000 and 5,000 shares of Shawano stock to Simon in violation of 18 U.S.C.A. §§ 2 and 201. Count four alleged that on October 9, 1961, Simon received $1,250 for the determination favorable to the taxpayers of taxes owing the United States by Leonhardt for 1954 through 1957 and by McGrath Securities for 1953 through 1956, in violation of 26 U.S.C.A. § 7214(a) (2).

### The Government's Evidence

The prosecution's case was constructed primarily on the testimony of co-conspirators Guterma, Eveleigh and Leonhardt. The jury was entitled to find from their testimony and supporting exhibits the following facts.

person to defraud the United States; or

"(7) who makes or signs any fraudulent entry in any book, or makes or signs any fraudulent certificate, return, or statement; or

"(8) who, having knowledge or information of the violation of any revenue law by any person, or of fraud committed by any person against the United States under any revenue law, fails to report, in writing, such knowledge or information to the Secretary or his delegate; or

"(9) who demands, or accepts, or attempts to collect, directly or indidirectly as payment or gift, or otherwise, any sum of money or other thing of value for the com-

Birnbaum, a certified public accountant and partner in the firm of Birnbaum & Birnbaum, met Leonhardt in 1951. Birnbaum's firm did Leonhardt's personal accounting work as well as that of McGrath Securities Corporation, an over-the-counter brokerage firm formed by Leonhardt and Guterma in 1953. Although Birnbaum's firm also served other corporations in which Leonhardt and Guterma shared an interest, it never acted as Guterma's personal accountant. In 1956, the Birnbaum firm ceased to act for Leonhardt and McGrath except that it was later called in to handle the tax examinations for the years in which it had prepared the returns. Prior to the termination of its employment, the Birnbaum firm had prepared the returns of McGrath and Leonhardt for the tax year 1955. It was in that year that Leonhardt bought the Wickersham Corporation from Guterma, a transaction which later occasioned the bribery of Simon.

### The Wickersham Transaction

In 1954 Birnbaum, along with two others, controlled the Paul Revere Uranium Corporation. They were anxious to float a uranium issue. At this same time, Guterma was looking for a way to issue additional shares of Shawano Development Corporation, a publicly held company of which he was President. Birnbaum arranged a meeting with his

promise, adjustment, or settlement of any charge or complaint for any violation or alleged violation of law, except as expressly authorized by law so to do;

shall be dismissed from office or discharged for employment and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both. The court may in its discretion award out of the fine so imposed an amount, not in excess of one-half thereof, for the use of the informer, if any, who shall be ascertained by the judgment of the court. The court also shall render judgment against the said officer or employee for the amount of damages sustained in favor of the party injured, to be collected by execution."

group and Guterma, and it was decided that instead of the floating of a new issue by Paul Revere, Shawano would buy Paul Revere's uranium assets in exchange for new Shawano shares. So that he would control a large portion of the new Shawano stock, Guterma persuaded Leonhardt to buy from Guterma the stock of the dormant Wickersham Corporation (a company wholly owned by Guterma) for Leonhardt's notes in the amount of $295,000, and then to have Wickersham purchase a large block of Paul Revere stock. Thereafter, upon Paul Revere's dissolution, Wickersham would obtain approximately 200,000 shares of Shawano which could be sold to the public through McGrath Securities. The profit on the sale of Shawano was to go to Guterma and he would give Leonhardt a percentage of the proceeds. It was understood that Leonhardt's profit on the transaction would be treated as capital gain, and to that end Leonhardt relied on Birnbaum's advice on how to handle his part of the venture. The plan was consummated.

As soon as Wickersham's Shawano stock had been sold to the public at a profit of $392,000, Leonhardt and Guterma arranged for the proceeds to be distributed to Guterma as "loans." Guterma, in turn, on June 7, 1955, "loaned" Leonhardt $102,000, an amount equalling the profit Leonhardt had anticipated. Six months after Leonhardt's acquisition, Wickersham was dissolved and its assets distributed to Leonhardt.

When he filed his 1955 tax return in August, 1956, Leonhardt declared his profit on the Wickersham transaction as a long-term capital gain. In addition, upon the advice of Birnbaum, he and Guterma at that time exchanged checks which had the effect of paying Leonhardt's obligation to Guterma for the purchase of Wickersham and of repaying Wickersham's loan to Guterma. It is the Government's theory that since Leonhardt's $102,000 profit was actually in his hands on June 7, 1955, less than six months after he had purchased Wickersham, serious questions would have arisen in the mind of an examining Internal Revenue agent about the propriety of the long-term capital gains treatment. Consequently, argued the Government, there was cause to influence his decisions.

### The Bribery of Simon

Leonhardt receive a telephone call in the fall of 1956 from Agent Simon, who announced that he had been assigned to audit McGrath's 1955 return. Their first meeting was not held until January, 1957, however, and at that time Leonhardt told Simon to see Birnbaum. After meeting with Simon, Birnbaum reported to Leonhardt that Simon "could be taken care of"; and, several months later, in April, Birnbaum told Leonhardt that the question of capital gains treatment of the Wickersham transaction could be settled for a payment of $5,000. Birnbaum also told Leonhardt that he and Simon had arranged to bring Guterma into the matter since Guterma had profited most from various deals in which he and Leonhardt had participated. Later in April, after Leonhardt had told Guterma of his conversation with Birnbaum, Simon and Birnbaum convened at Guterma's office where, after some bickering, it was agreed that Guterma would give Simon $10,000 and 5,000 shares of Shawano stock. About ten days later, Eveleigh, Guterma's right-hand man, transferred the stock and cash to Simon. Eveleigh testified that although Birnbaum was present at Guterma's office when this payment was made, at Birnbaum's request he did not make the payment while Birnbaum was in the same room. This bribe was the basis of counts two and three of the indictment.

In the summer of 1957, Birnbaum informed Leonhardt that he (Leonhardt) was going to have to pay some $20,000 more than Birnbaum had earlier anticipated. Leonhardt only agreed, however, to pay $10,000 then and "five or six later on if [he] could afford it." On September 17, 1957, Leonhardt gave Birnbaum the $10,000 in cash.

Another meeting between Birnbaum, Leonhardt and Simon occurred in April, 1958, at Birnbaum's office, at which Birnbaum expressed his dissatisfaction with Leonhardt's "not coming up with the money" and his anxiety because of Guterma's difficulties with the Government. According to Leonhardt, when he insisted that he had no funds and was deeply in debt, Birnbaum retorted: " 'If you [Leonhardt] have any further payments to make, you have to pay Mr. Simon, and you pay him directly from now on' * * *." Thereafter, Simon continued to badger Leonhardt in an unsuccessful effort to make Leonhardt pay.

In July of 1961, four years after Leonhardt's payment of $10,000 to Birnbaum for Simon, Leonhardt told the Federal Bureau of Investigation of the Simon bribery. Then, acting in cooperation with the federal authorities, Leonhardt arranged a meeting with Simon for September 13, 1961 and at that time told him that he would be able to pay more of the money, although he thought the amount unfair. Leonhardt testified that to this Simon replied:

> "Well, it was my own fault because he had made direct contact with me, and from the very first day I sent him to Birnbaum, that Birn-baum had declared himself a partner in the deal and that Birnbaum had kept most of the money, and he had told me this before over the years, but this time he was very emphatic about the thing, and I requested permission to go confront Birnbaum and say, 'You kept my money, you know. Either give it to the man or give it back to me.' "

This conversation was recorded by a device that Leonhardt was wearing at the time, as were two other conversations between the two during the first week of October, 1961. Finally, on October 9, 1961, at Leonhardt's apartment, as FBI agents recorded the event with a concealed movie camera and recording apparatus, Leonhardt gave Simon $1,450 in marked money of which Simon

for no disclosed or apparent reason returned $200. Immediately thereafter Simon was arrested. This transaction was set forth in count four of the indictment which named Simon alone.

Birnbaum took the stand in his own defense, and denied the accusations made by Leonhardt, Guterma and Eveleigh. Simon did not testify.

The numerous points raised by appellant, all claimed to warrant reversal of the conviction, may be outlined briefly: (1) the trial court committed error in admitting Leonhardt's hearsay account of Simon's September 13, 1961 statement concerning Birnbaum; (2) error resulted when the prosecution was permitted to introduce testimony and FBI motion pictures of the passing of money between Leonhardt and Simon on October 9, 1961; (3) the Government improperly interjected the innuendo that Birnbaum had "fixed" a case before the New York Attorney General's office; (4) that the prosecutor suggested guilt by association in bringing out Birnbaum's substantial profits in transactions in the stock of Guterma-controlled corporations; (5) that Jencks Act material was improperly withheld from the defense; (6) that the Trial Court belittled and demeaned defense counsel; and (7) the jury was improperly charged.

### Admission of Hearsay Evidence

Appellant cites Leonhardt's recitation of Simon's statement on September 13, 1961, that Birnbaum had at the outset "declared himself a partner" and had "kept most of the money" as reversible error. He contends that Simon's declaration was not made during the pendency of the conspiracy and in furtherance of its objects and, therefore, was not within the declaration of co-conspirators exception to the hearsay rule. See Krulewitch v. United States, 336 U.S. 440, 443–444, 69 S.Ct. 716, 93 L.Ed. 790 (1949); Fiswick v. United States, 329 U.S. 211, 217, 67 S.Ct. 224, 91 L.Ed. 196 (1946); Logan v. United States, 144 U.S. 263, 309, 12 S.Ct. 617, 36 L.Ed. 429 (1892); 72 Harv.L Rev

920, 985–86 (1959). More specifically, appellant argues that Simon's statement was a "merely narrative" declaration of a past fact and thus inadmissible under the rule of United States v. Goodman, 129 F.2d 1009, 1013 (2d Cir. 1942) and Van Riper v. United States, 13 F.2d 961, 967 (2d Cir.), cert. denied sub nom. Ackerson v. United States, 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848 (1926). See also United States v. Borelli, 336 F.2d 376, n. 4 (2d Cir. 1964); United States v. Annunziato, 293 F.2d 373 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); United States v. Compagna, 146 F.2d 524, 530 (2d Cir. 1944), cert. denied, 324 U.S. 867, 65 S. Ct. 912, 89 L.Ed. 1422 (1945).

On its face, Simon's statement appears to be no more than his account of the facts of Birnbaum's past activities. However, the Government suggests that the statement was made in furtherance of the conspiracy and, therefore, competent against Birnbaum. Thus, it is argued that the purpose of Simon's statement about Birnbaum's past double-dealing was to induce Leonhardt to honor his part of the bribery scheme by paying the balance of the money he owed. On these facts, such a construction is too tenuous to admit this evidence. Compare United States v. Annunziato, supra, where the payment concerning which the hearsay statement was made lay in the future. "[T]he fact that one conspirator tells another something relevant to the conspiracy does not alone make the declaration competent; the declaration must itself be an act in furtherance of the common object; mere conversation between conspirators is not that * * *." United States v. Nardone, 106 F.2d 41, 43 (2d Cir.), rev'd on other grounds, 308 U.S. 338, 60 S. Ct. 266, 84 L.Ed. 307 (1939). This evidence should not have been received.

The result we reach on these facts comports with the agency rationale that has traditionally supported the co-conspirators hearsay exception. Declarations of a co-conspirator (Simon) are competent against an absent defendant (Birnbaum) "because they are a part of the execution of the plan, and have been impliedly authorized by the others." United States v. Kelley, 105 F.2d 912, 916 (2d Cir. 1939); see Lutwak v. United States, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1952); United States v. Olweiss, 138 F.2d 798, 800 (2d Cir. 1943); Van Riper v. United States, supra, 13 F.2d at 967. Simon's accusation, however, fell well outside the scope of his authority as a conspiratorial agent of Birnbaum and can hardly be said to bear Birnbaum's implied authorization. Obviously, Birnbaum would not want Leonhardt to know that he had converted any of the funds Leonhardt had given to him for Simon.

Appellant advances as an alternative ground that Simon's statement to Leonhardt about Birnbaum did not occur during the pendency of the conspiracy. Appellant contends that the one object of the conspiracy, Simon's corrupt examination of the tax returns, terminated in January 1958 when Simon's report on Leonhardt's and Guterma's 1955 returns had been approved by his superiors and the year closed, and that since April 1958 it had been understood that Leonhardt was thenceforward to deal directly with Simon and make any further payments without Birnbaum's intercession. Appellant also argues that any conspiracy to bribe Simon was frustrated when Leonhardt turned himself in to the FBI in July 1961. The Government counters by saying that the proof at trial established a conspiracy which encompassed the returns of other years which remained open in 1961, that Birnbaum's April 1958 statement actually encouraged Leonhardt to continue with the conspiracy and that in any event Birnbaum himself could well have paid Simon the final installments of the bribe.

Few crimes are committed to be continued in perpetuity. Assuming here that in 1957 Birnbaum did arrange, and personally participate as a go-between in the delivery of money, for the bribery of Revenue Agent Simon by Leonhardt, for all practical purposes Birnbaum's

task was completed at that time. There was no proof that Birnbaum guaranteed payment of the full amount or that payment was to be made only after Simon's final audit had been approved. To the contrary, the testimony indicates that at least from April 1958 on, it was Leonhardt's responsibility to make any payments still due directly to Simon.

From the proof in the record, Birnbaum may well be guilty of participating in Simon's bribery. Resolution of this fact is for the next trial. All that is before us now is the admissibility of the September-October 1961 incidents. That they may have been highly prejudicial to a jury is scarcely open to question. Leonhardt's testimony of his conversation with Simon in September 1961 to the effect that Simon said that Birnbaum had "declared himself a partner" and had "kept most of the money" was purely hearsay evidence and put Birnbaum completely at the mercy of two persons who at that time had little regard for Birnbaum's welfare. This testimony was inadmissible and alone may well have tilted the scales against Birnbaum.

■ In Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481 (1953), the Supreme Court recognized the difference between acts and statements and held that "acts, being relevant to prove the conspiracy, were admissible even though they might have occurred after the conspiracy ended." Lutwak at 618, 73 S.Ct. at 489. The passing of money to Simon may have had some probative value relating to the existence of the original bribe arrangement. The size of the payment, the curious and unexplained repayment of the $200 and the particular returns involved were facts which the defense might argue had little or no weight in resolving the issues before the jury. However, within the narrow range set forth in Lutwak, the money passing was admissible.

■ Appellant's claim that evidence of the October money passing was presented in an unduly prejudicial form must fail. Upon the trial appellant did not object to the presentation of proof upon the asserted ground of prejudice in the form of presentation, namely, the calling of three FBI agents, the introduction in evidence of $1,250 in currency and the darkening of the courtroom for the projection of a motion picture depicting the October 9th money passing. Quite apart from the failure to object, however, in this day and age of photographic and recording devices, there is no reason why relevant conversations and scenes should not be brought before the jury by these means. The trial judge in balancing the probative value of the evidence against its possibly prejudicial effect is vested with broad discretion.

### Evidence of Birnbaum's Association with Guterma-controlled Enterprises

1. *The Recommendation of an Attorney Incident.*

■ In his cross-examination of the Government witness Guterma, Birnbaum's defense counsel sought to minimize the scope of Birnbaum's relationship with Guterma, Leonhardt and their enterprises. On redirect, the Government over objection adduced from Guterma the fact that Birnbaum had recommended an attorney to help "straighten out" a matter concerning Guterma's Gladeview corporation, then pending in the New York State Attorney General's Office. The prosecutor asked if as a result of the representation by the attorney the matter was dropped. Guterma replied in the affirmative, and said in addition that Birnbaum had told him that the attorney was "a very influential man and was an attorney with the Attorney General's Office." Motions for a mistrial and to strike the testimony were denied. Appellant characterizes these portions of the testimony as a deliberate effort by the prosecutor to plant suspicion and to convey by innuendo the impression that Birnbaum was a "fixer."

There can be no doubt of this result, whether so intended or not, and of the

prejudicial effect upon a jury. There had been no proof whatsoever of the nature of the matter in the Attorney General's Office or the merits thereof. The normal presumption should be, absent proof to the contrary, that if the Attorney General "dropped" the matter, he did so because it should have been dropped. If he had been convinced by some attorney to take such action, the presumption should be that the attorney presented good and sufficient arguments in support thereof. It would indeed deprive defendants of fair trials on the issues relevant to the specific charges against them if juries were allowed to draw unwarranted inference from such unrelated, irrelevant matters. See United States v. Beno, 324 F.2d 582, 589 (2d Cir. 1963). Anyone reckless enough to recommend as attorney the president of his local Bar Association would be suspect for having selected a man of prominence who would be so influential before administrative officers that if the outcome were favorable this result *per se* could be viewed with suspicion by a jury. And, even if the attorney might have arranged a "fix" (of which there was no proof), this fact would have been totally irrelevant to the crimes charged, i. e., conspiracy and the bribery of Simon. Compare United States v. Stadter, 336 F.2d 326 (2d Cir. 1964); United States v. Eury, 268 F.2d 517 (2d Cir. 1959); United States v. Barnett, 280 F.2d 889 (2d Cir. 1960). This testimony was inadmissible and prejudicial.

### The Alleged Jencks Act Statements

■■■■ Following his September 13, 1961 meeting with Simon, Leonhardt had two conversations with Birnbaum. On October 2, 1961, Leonhardt met Birnbaum at Birnbaum's office and four days later they conversed over the telephone. Both conversations were recorded by the FBI. Appellant now claims reversible error in the trial court's failure, after *in camera* inspection, to order the production of the transcripts of these conversations pursuant to 18 U.S.C.A. § 3500. Appellant concedes that the Gov-

ernment did not examine Leonhardt about either of these conversations and that he made no mention of them in his direct testimony. Nevertheless, in view of Leonhardt's testimony of his conversation with Simon, appellant urges that it would be highly significant, as bearing upon the truth of Leonhardt's testimony, to know whether or not Simon's accusations were brought up in subsequent conversations with Birnbaum. There is no dispute that the transcripts are "statements" within the meaning of subsection (e) of the Act. The question is whether they relate "to the subject matter as to which the witness has testified." Whether a witness' statement is "related to" his direct examination depends on whether the statement sought to be produced relates "generally to the events and activities testified to." United States v. Cardillo, 316 F.2d 606, 615 (2d Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). It is for the trial court to determine which statements are sufficiently related and which are merely "incidental or collateral," United States v. Cardillo, supra.

To support the trial court's ruling, the government relies on the fact that it made no inquiry as to either conversation on its direct examination. Thus, the government contends that if it does not examine as to specific conversations, "a witness' statement regarding those conversations should not be produced, even if, arguably, they could have some impeachment value" and that "the Court should only order production when the activities and events testified to on direct examination are substantially identical with activities and events discussed in prior statements." This reasoning is too restrictive and appears to be the same as that recently rejected in United States v. Borelli, 336 F.2d 376 (2d Cir., July 31, 1964). In that case the document in question was a witness' letter to the Government in which he proposed to assist the Government in exchange for special consideration for himself. "We can see no reason why a statement that would support impeach-

ment for bias and interest does not 're-late' to the witness' testimony as much as a statement permitting impeachment for faulty memory, Rosenberg v. United States, 360 U.S. 367, 370, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959)." In Rosenberg, supra, the Court observed: "A statement by a witness that she fears her memory as to the events at issue was poor certainly 'relates to the subject matter as to which the witness has testified' and should have been given to the defendant." 360 U.S. at 370, 79 S.Ct. at 1234. From Rosenberg and Borelli, it seems plain that the witness need not have testified on direct to the specific conversation or document; but it is also clear that not all statements that might in some way be helpful in impeaching the witness are producible. It hardly warrants repeating that particular facts must control—and, "The possible permutations of fact and circumstance are myriad." Palermo v. United States, 360 U.S. 343, 353, 79 S.Ct. 1217, 1225, 3 L. Ed.2d 1287 (1959). The object of these conversations, of course, was to garner evidence of appellant's complicity in the bribery scheme. We have examined the transcripts of the conversations and despite appellant's argument that lack of mention of the earlier Simon-Leonhardt conversations in itself could have proved valuable for impeachment purposes, we are unable to agree that the trial court's ruling can be fairly characterized as clearly erroneous. This determination does not mean that on a new trial when the facts may be developed in a different manner, a different position should not be taken and that the trial judge may not exercise his discretion in a different manner.

**2. Birnbaum's Profits in Other Guterma Enterprises**

■ Evidence that Birnbaum had made substantial profits in transactions in stock with which Guterma was connected was admitted. While this inquiry may have been somewhat far afield, it may have had a bearing on Birnbaum's relationship with the other conspirators. Although counsel are entitled to consid-erable leeway in cross-examination, upon any new trial the court should be satisfied of the relevance of such testimony to the bribery charge. The mere fact that Birnbaum may have made profits in Guterma companies standing alone would scarcely seem probative of bribery of a Revenue Agent.

*Other Trial Errors*

Appellant's attack on the trial court's conduct of the case is without merit. We have examined the statements of the trial court to defense counsel in the context in which they occurred and find that while some of them might better have gone unsaid, there has been no showing that the remarks were sufficiently prejudicial to call for reversal. See United States v. Ross, 321 F.2d 61, 66 n. 3 (2d Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963); Goldstein v. United States, 63 F.2d 609, 613 (8th Cir. 1933); cf. United States v. Persico, 305 F.2d 534, 540, (2d Cir. 1962); United States v. Ah Kee Eng, 241 F.2d 157, 161 (2d Cir. 1957).

Appellant challenges that portion of the trial court's charge pertaining to evidence of his previous good character which instructed the jury as follows:

"It may be that those with whom he had some contact, had come in contact with previously, had been misled and he did not reveal to them his true character."

Appellant concedes that virtually the same charge was held to have properly placed the issue of good character before the jury in United States v. Kabot, 295 F.2d 848, 855 (2d Cir. 1961), cert. denied, 369 U.S. 803, 82 S.Ct. 641, 7 L. Ed.2d 550 (1962) but urges reconsideration of the instruction.

■ In the Kabot case, this court did say as to a charge containing a sentence almost identical with the sentence now under attack that "Taken as a whole, the charge properly places the evidence of good character before the jury * *." (295 F.2d at 855). In the absence of proof developed on cross-examination of the character witnesses, that they had

little or inadequate knowledge of the defendant's true character, it should not be assumed that the character witnesses may have been "misled." "Misled" always imports an active misleading by someone or by some circumstances. The record does not show any foundation for such an assumption. Therefore, this assumption should not have been incorporated into the charge. Upon reconsideration, we withdraw any approval of this sentence which Kabot may appear to give absent supporting proof.

Reversed and remanded for a new trial.