**UNITED STATES of America,
Appellee,**

**v.**

**Frank CRISONA, Anthony DeLyra, John DeLyra, and Frank Lloyd Parks,
Defendants-Appellants.**

**Nos. 624–627, Dockets 33130–33133.**

United States Court of Appeals
Second Circuit.

Argued May 23, 1969.

Decided Sept. 25, 1969.

---

See also D.C., 271 F.Supp. 150.

Maurice Edelbaum, New York City, for appellant Crisona.

James M. La Rossa, New York City, for appellant Anthony DeLyra.

Joshua N. Koplovitz, New York City (Koplovitz and Fabricant, on the brief), for appellant John DeLyra.

Eugene J. Moran, New York City, for appellant Parks.

James D. Zirin, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, Kevin J. McInerney, Elkan Abramowitz, Asst. U. S. Attys., on the brief), for appellee.

Before LUMBARD, Chief Judge, FEINBERG, Circuit Judge, and TIMBERS, District Judge.*

FEINBERG, Circuit Judge:

This appeal is from four judgments of conviction entered in the United States District Court for the Southern District of New York on December 11, 1968, after a four week trial before Thomas F. Murphy, J., and a jury. Defendant Frank Crisona was found guilty on ten counts covering violation of the wire fraud statute, 18 U.S.C. § 1343, inducing interstate travel in execution of a fraud and interstate transporation of the proceeds of a fraud, 18 U.S.C. § 2314, and conspiracy, 18 U.S.C. § 371. Defendants Anthony and John DeLyra were found guilty on substantially similar counts and also on one count of mail fraud, 18 U.S.C. § 1341. Frank Lloyd Parks was convicted of a total of seven counts for wire and mail fraud, interstate travel in execution of a fraud, and conspiracy. The first three defendants were each sentenced to three years, and Parks to one year, imprisonment on all counts to run concurrently. Prior to trial two other defendants, Dominic C. Lonardo and John Martin Neiman, pleaded guilty to one and 17 counts, respectively, and subsequently Neiman testified as a government witness.

### I. THE CONSPIRACY

The indictment charged all four appellants, Neiman and Lonardo with conspiring to defraud and actually defrauding many individuals and corporations. While only Parks challenges the suffi-

---

\* Chief Judge of the District of Connecticut, sitting by designation.

ciency of the voluminous evidence developed at trial, a summary of the numerous and complex financial dealings which underlie appellants' convictions is helpful in considering the various legal issues raised. The evidence introduced by the Government allowed a jury to find the following.

Crisona, a former Assistant District Attorney for Queens County, New York, first met Neiman, whom the Government aptly describes as "a professional confidence man with a long criminal record," in October 1964, when they engaged in a joint attempt to salvage financially a summer camp in which Crisona had an interest. The attempt failed, and the camp was lost, leaving Crisona $15,000 in debt to a loan shark, but the business association between the two men survived. In the summer of the following year, Neiman entered into negotiations with one William Sikora, a New Jersey real estate operator, to provide Sikora with a commitment for a $3,000,000 loan, and persuaded him to pay a security deposit of $10,000 in the form of a check made out to Crisona, as attorney, to be held in escrow pending the funding of the loan. Crisona promptly cashed the check and split up the proceeds between himself, Neiman and Crisona's loan shark. Apparently during this period Crisona first met Anthony DeLyra, with whom Neiman had done business in the past, and Parks, a former stockbroker who used an office in the same building as John DeLyra. Anthony was introduced to Sikora as an individual who would advance sums for the latter's loan and Parks was presented to him as the stockbroker who was going to handle the financing. Evidently no loan was ever consummated.

In October 1965, Neiman and the DeLyras somehow came into possession of a stolen $9,200 cashier's check payable to a recently deceased woman named Mary McCarthy. Pursuant to Crisona's suggestion a joint checking account in the names of Mary McCarthy and a fic-

titious John O'Brien was opened in a branch of the Franklin National Bank and the check deposited in it. Within the next few days Crisona signed two checks in the name of John O'Brien for $5,600 and $3,500 and he and Neiman then cashed them at the bank and divided up the proceeds among themselves and the two DeLyras. The bank, however, discovered that Mary McCarthy was dead. The check was dishonored, and Crisona was notified that he would be held responsible for the $9,100 overdraft.

In November 1965, Neiman, Crisona and the DeLyras, who were apparently all in debt, and Parks, who was unemployed, devised their basic scheme of utilizing a foreign corporation owned by John DeLyra, Columbia Resources, Ltd., to issue real estate financing commitments. To make the corporation appear financially sound, they prepared a false financial statement showing a net worth of $11,000,000,[1] which was submitted to Dun and Bradstreet as a basis for a credit rating, along with false résumés of the backgrounds of four officers of Columbia, two of whom were pseudonyms for Neiman and Anthony DeLyra. Utilizing this false statement, and the excellent Dun and Bradstreet rating they eventually received, and variously presenting themselves as officers of the corporation, often under assumed names, the defendants thereafter used Columbia Resources as a front for obtaining advance fees from various individuals and corporations in return for letters of intent or commitments to secure real estate financing. In most instances the advance was presumably to be held in escrow by Crisona, as attorney, pending the funding of the loan, but was in fact immediately distributed among Neiman and the defendants. None of the Columbia loan financings was ever consummated.

The specific transactions of this nature which form the basis of the various counts on which appellants were indicted

---

1. This was later altered to show even greater worth.

may be outlined briefly, as they all follow substantially the same pattern.

(1) *Kline.* In November 1965, Neiman was referred to a Boston real estate developer, Sydney Kline, to whom he sent a copy of the false financial statement and offered a commitment for a $700,000 first mortgage to finance a nursing home which Kline planned to construct. A man named Graeber, acting for Neiman, went to Boston and attempted to secure a two per cent standby fee or deposit from Kline in return for a commitment letter. At Graeber's suggestion Kline spoke on the telephone to Crisona, who assured him that Columbia was a reputable firm which he had often represented and that Kline's check for the advance fee would be held in escrow pending completion of the transaction. Kline then wrote out a check for $13,500 to Crisona which Crisona, when he received it, promptly cashed and distributed among his colleagues.

In late December, a second commitment of $125,000 for another nursing home was arranged with Kline after a purported appraisal of the property by John DeLyra, under a false name, who elicited another standby fee check for $2,500 which was again supposed to be held in escrow. When Kline became suspicious of the lack of progress in the financing he called Crisona and asked for his money back, but was told that it had been turned over to Columbia.

(2) *Sunrise Mountain Corp.* In December 1965, Neiman made contact with A. Earle Brown, the owner of Sunrise Mountain, a development corporation which was in Chapter XI reorganization; Brown was seeking a $3,000,000 loan for a real estate project in Las Vegas. At initial meetings between Brown, Neiman—under an assumed name—and Crisona, it was agreed that Sunrise would pay a $30,000 standby fee to Columbia for a $3,000,000 loan commitment. Crisona assured Brown of the corporation's reliability and its ability, based on the false financial statement, to fund the loan. Subsequently, Brown and his attorney, Richard Crake, met with Crisona,

Neiman and Parks, who was introduced as a Columbia officer who acted as a West Coast liaison man. Crisona again made assurances of his own and Columbia's respectability and it was agreed that out of the standby payment Crisona would receive a $7,500 attorney's fee with the balance being placed in escrow. As the date when the funding was scheduled drew near, however, Crisona persuaded Brown and Crake, who was co-escrowee with Crisona, to release the escrow fund, finally assuring them that the closing of the funding would take place the same day. Crisona immediately deposited the escrow check and distributed the proceeds, using a portion of them to pay off the overdraft caused by the McCarthy-O'Brien transaction. He never showed up for the closing, which continued to be repeatedly postponed with a variety of excuses. During January 1966, Crake had a number of telephone conversations with Neiman, Crisona, and Parks, at least some of which he tape recorded. On January 19, Crake and Brown finally went to the office of the United States Attorney for the Eastern District of New York and requested an investigation of Columbia.

(3) *Tuller.* At approximately the same time, Neiman and Anthony DeLyra, again using false names, obtained a check for $8,500, in return for a letter of intent to obtain a $850,000 loan for a Julliard Tuller of Silver Spring, Maryland. As usual, the closing of the loan was repeatedly delayed and as a result, the mortgage on Tuller's property was foreclosed at a loss of $300,000.

(4) *Menlove.* In February 1966, Parks and Neiman persuaded Roy Menlove, a Salt Lake City motel owner, to put up an advance fee of $11,000 for a prospective $1,100,000 loan by Columbia, after Parks had conducted an "appraisal" of Menlove's property and Menlove had been furnished a copy of the Dun and Bradstreet report based on the false financial statement on Columbia. The loan closing was twice adjourned and never took place.

(5) *Fazio.* In return for a letter of intent to provide a $1,500,000 loan for a motel, a Mr. Fazio in Cleveland gave Neiman a check for $11,500 on account. The loan was not funded.

(6) *Howard Rome.* In April 1966, after negotiations between Neiman, Parks, John DeLyra, Crisona and a Howard Rome in Cleveland, it was agreed to arrange a $1,350,000 loan for Rome with a $13,500 advance fee. Once again these negotiations involved an "appraisal" by Parks, false financial information, aliases and a variety of lies about the identity and experience of purported Columbia Resources executives. Crisona dissuaded Rome from putting the advance in escrow and it was divided among various participants.

(7) *Indianapolis.* In July 1966, Neiman and John DeLyra persuaded Morris Mitchell and Ary Infante, Indianapolis businessmen, to advertise that their company had funds available for loans and to refer prospective customers to Columbia in return for 25 per cent of advance fees collected. Over the following weeks Neiman and the two DeLyras collected a total of $19,000 in advance fees from customers so recruited.

Defendant Crisona testified in his own behalf that he had acted exclusively as a lawyer in the transactions with which he was involved, that in effect he was innocently misled by Neiman and that he never intended to defraud anyone or knowingly made any false representations. By its verdict the jury clearly discredited this testimony. Defendant Parks testified that he was unaware of the fraudulent nature of the enterprises and that the appraisals he conducted were done in good faith. Neither of the DeLyras took the witness stand.

On appeal, defendants jointly and separately raise a number of claims of error in the proceedings below. In addition, appellant Parks attacks the sufficiency of the evidence against him. We will discuss these various arguments in turn; as will be seen, we find none of them persuasive.

## II. FAILURE TO TURN OVER TAPE RECORDINGS

Crisona's main argument on appeal, adopted by all of the other defendants insofar as applicable to them, relates to the district court's refusal to order the Government to turn over to the defense tape recordings made by Crake, the lawyer in the Sunrise Mountain Corporation transaction, of various telephone conversations. Crake testified about one such conversation, held on January 18, 1966, in which Crisona told Crake that the $7,500 advance fee had been turned over to Columbia Resources, reassured him that the corporation was "legitimate," and described to him some of the other successful "deals" by Columbia on which Crisona had worked. Toward the end of Crake's direct testimony, he identified a tape, which was subsequently received in evidence and played to the jury, as a recording of this January 18 telephone conversation. Crake also recorded a number of other telephone conversations including several with Crisona and Neiman and Parks. Crake turned these tapes over to the F.B.I., but none was introduced at trial except for the one of the January 18 conversation. At trial, defense counsel called for the production of all of the tapes, basing their request alternatively on 18 U.S.C. § 3500, Rule 16 of the Federal Rules of Criminal Procedure, and the doctrine of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial judge denied disclosure of the tapes on all three grounds, and all are raised here on appeal. Defense counsel also asked the judge to listen to the tapes himself or to mark and seal them as a court exhibit for appellate review, but he declined both suggestions.

1. *Section 3500*

Appellants' first argument is that the tapes should have been turned over to the defense under the provisions of the Jencks Act, 18 U.S.C. § 3500:

> (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the

United States which was made by a Government witness * * * to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

Under subsection (e) the term "statement" as used in subsection (b) is defined as:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement.

The court below declined to order the tapes turned over to defense counsel under section 3500. The apparent ground for the ruling was that Crake had not testified about any recorded conversation other than the one on January 18—the transcript and tape of which were turned over since the Government introduced them into evidence—and there was no showing that the remaining tapes related to the subject matter of the direct testimony. We need not consider the correctness of this restrictive interpretation of section 3500 (b), see United States v. Birnbaum, 337 F.2d 490, 497–498 (2d Cir. 1964), since we find that the tapes were not "statements" within the meaning of the Jencks Act. The tapes of these telephone conversations do not come within subsection (e)(2) as they are not recordings

of oral statements made to a government agent. Nor, as appellant Anthony De-Lyra contends, are the recordings and the transcripts made from them "in effect" a written statement under subsection(e)(1).

Our decision in United States v. Birnbaum, *supra,* is not inconsistent with this analysis. There we upheld the refusal of the trial judge to turn over to the defense tape recordings of two conversations between the defendant, indicted for bribing an Internal Revenue agent, and a government witness. While we noted that "[t]here is no dispute that the transcripts [of the recorded conversations] are 'statements' within the meaning of subsection (e) of the Act," 337 F.2d at 497, that dictum was based on circumstances in which the recordings were made at the direction of the F.B.I. with the specific objective "to garner evidence of appellant's complicity in the bribery scheme." *Id.* at 498. In the factual situation there present the statements of witnesses might reasonably be construed as being made "to an agent of the Government." Indeed, there is authority for interpreting the Jencks Act not to apply at all to the sort of pre-investigatory communications involved in this case. Thus, the Seventh Circuit, upholding a refusal to turn over to the defense a contemporaneous tape recording of a conversation between the payer and the recipient of a bribe—witness and defendant, respectively—in a subsequent prosecution for extortion, has defined Jencks Act material succinctly:

A § 3500 statement is a recorded recital of past occurrences made by a prospective prosecution witness. From its very nature, necessarily it is made after those events have taken place.

United States v. Sopher, 362 F.2d 523, 525 (7th Cir.), cert. denied, 385 U.S. 928, 87 S.Ct. 286, 17 L.Ed.2d 210 (1966). Cf. Battaglia v. United States, 349 F. 2d 556, 560 (9th Cir.), cert. denied, 382 U.S. 955, 86 S.Ct. 430, 15 L.Ed.2d 360 (1965). We need not now decide whether we would similarly limit the scope of material obtainable under the Act in an

appropriate case, although our dictum in *Birnbaum* clearly looks the other way. It is sufficient for the purposes of this appeal that the telephone conversations of witness Crake were in no sense "to an agent of the Government." [2]

### 2. *Rule 16(a)*

Appellants next contend that the tapes or transcripts should have been produced under Fed.R.Crim.P. 16(a):

> Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph any relevant (1) written or recorded statements or confessions made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, * * *.

The trial judge denied such a request on the theory that the section does not cover statements made by a defendant prior to arrest.[3] On appeal the Government vigorously defends that ruling, contending that "statements or confessions" under Rule 16(a) do not include pre-arrest statements made by a defendant during the course of the commission of a crime. The question has divided trial judges; the authorities were collected most recently by Judge Frankel in the Southern District of New York in a thorough opinion. United States v. Rosenberg, 299 F.Supp. 1241 (S.D.N.Y. 1969). While noting that the judges of that district had reached different conclusions on the subject, he concluded that tape recordings taken of conversations in which the defendant allegedly offered an Internal Revenue agent bribes were clearly "statements" under Rule 16(a) and discoverable by defendant. For similar district court rulings, see, e. g., United States v. Lubomski, 277 F. Supp. 713, 719–722 (N.D.Ill.1967); United States v. Iovinelli, 276 F.Supp. 629, 630–631 (N.D.Ill.1967); United States v. Leighton, 265 F.Supp. 27, 34 (S.D.N.Y.1967); cf. United States v. Baker, 262 F.Supp. 657, 671–672 (D.D.C. 1966). The bases of these decisions have been that the language of amended Rule 16(a) is unqualified in contrast to the limited definition of "statement" in section 3500, that the Notes of the Advisory Committee indicate that the amended Rule was intended to apply even to pre-arrest statements made by a defendant *during the course of his crime* and was meant to broaden materially the scope of discovery available to a defendant,[4] that such a statement is obviously of such vital importance to the defense that fairness compels its disclosure, and that guilty pleas will thereby be encouraged. This broad interpretation of "statement" in Rule 16(a) is sup-

---

2. The record indicates that at one point during the trial counsel for defendant Parks speculated that Crake, since he had been to see the United States Attorney in Brooklyn, might have been acting at the latter's direction in taping the conversations and thus "as an agent" of the Government. The trial judge suggested that counsel could readily ascertain that fact by asking either that government attorney or Crake. Counsel did not pursue the matter further on the record. In any event, it is clear that Crake began taping the conversations before he visited the United States Attorney and there is nothing in the record to indicate that he continued to do so by virtue of governmental instructions.

3. Before the trial, Judge Mansfield denied a similar Rule 16(a) motion by Anthony

and John DeLyra on the ground that a recording made at the time of an offense is not a statement under 16(a). United States v. Crisona, 271 F.Supp. 150, 157 and n. 15 (S.D.N.Y.1967), modified in unpublished memorandum, Jan. 10, 1968.

4. In amending the Rule in 1966, the Advisory Committee noted that:

> The defendant is not required to designate because he may not always be aware that his statements or confessions are being recorded. * * * Discovery of statements and confessions is in line with what the Supreme Court has described as the "better practice" (Cicenia v. LaGay, 357 U.S. 504, 511, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958)) * * *.

ported by the recent recommendation of the ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial 62 (1969) that a defendant receive before trial all of his statements

> regardless of to whom they were made—whether a prosecuting attorney, an investigator, a grand jury * * *, or anyone else. It is also intended that statements be discoverable regardless of how they are obtained, whether surreptitiously or voluntarily.

We agree with these conclusions and see nothing in the plain language of Rule 16 (a) or the Notes of the Advisory Committee accompanying it which would justify imposing the limitation suggested by the Government. See United States v. Knohl, 379 F.2d 427, 441–442 (2d Cir.), cert. denied, 389 U.S. 973, 88 S. Ct. 472, 19 L.Ed.2d 465 (1967) (dictum).

Having concluded that the tapes of defendants' conversations are "statements" under Rule 16(a), we must still decide whether failure to turn them over was reversible error. The Government points out that the language of the section is not mandatory—"the court *may* order the attorney for the government" (emphasis added)—and indeed this has been the focus of another dispute in the district courts over what showing of need, if any, a defendant must make in the ordinary case to compel inspection of his statement. E. g., compare United States v. Projansky, 44 F.R.D. 550 (S.D. N.Y.1968), with United States v. Louis Carreau, Inc., 42 F.R.D. 408 (S.D.N.Y. 1967). We note that weighty scholarly authority supports the proposition that withholding a defendant's statement should be the exception, not the rule, subject to the court's power to impose a protective order when appropriate. See

ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial 52–53, 58–61 (1969); 8 Moore, Federal Practice ¶ 16.05[1] (2d ed. 1969). However, we need not discuss that issue more fully because the trial judge here ruled as a matter of law—not of discretion—that the tapes did not qualify as statements.

■ On the facts of the present case, however, we hold that the trial judge's failure to compel disclosure of the tape recordings under Rule 16(a) was not reversible error. Aside from the one recorded conversation to which Crake testified and which was played to the jury, a transcript of which was furnished the defense, none of the others was introduced in evidence. While none of the latter tapes was otherwise made available to the defendants, we have closely examined the transcripts [5] of the tapes and find that they contain no information which could reasonably have been additionally useful to the defense. Moreover, we note that the cumulative evidence of defendants' guilt adduced at trial was very substantial indeed. In sum, while the tape recordings of conversations of defendants were "statements" under Rule 16(a), we find that the court's failure to make them available was not in fact harmful.[6] Cf. Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959); United States v. Annunziato, 293 F.2d 373, 381–382 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed. 2d 134 (1961). We are well aware that the usefulness of such statements should ordinarily be assessed by defense counsel rather than by us, and we expect that that will be the procedure in the future. In any event, we will apply the interpretation of Rule 16(a) that we adopt

---

5. These have been furnished to us by the Government, and we are lodging them with the Clerk of the Court in a sealed envelope pending further review, if any, of the case.

6. We put to one side the fact that counsel for Parks did not specifically request the

tapes at trial. We note that it was not clear at trial that conversations with Parks had been recorded; that information is disclosed by the transcripts of the tapes.

here to all motions made thereunder after this opinion is filed.

### 3. *Brady v. Maryland*

The third ground of alleged error involving the tapes is based on the doctrine of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), under which the prosecution is required to turn over to the defense any material evidence in its possession which is favorable to the accused. Although the prosecution below represented to the trial judge that there was no exculpatory or contradictory information in the tapes, defendants maintained that the trial judge should himself listen to the tapes in order to determine whether the defense was entitled to obtain them in the interest of justice. The trial judge declined to do so, and appellants argue that a government prosecutor cannot be expected to be able to make a meaningful evaluation of what material may be useful to defense counsel and that, at the least, possibly useful material should be objectively reviewed by the trial judge. We realize that the problem is a real one which has been the subject of substantial discussion. See, e. g., ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial 73–78 (1969); Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant, 74 Yale L.J. 136, 147–49 (1964). However, appellants themselves concede the lack of any precedent for such a procedure, and indeed, this court has very recently restated the present legal principle that, with certain limited exceptions not here applicable, "the assurance by the government that it has in its possession no undisclosed evidence that would tend to exculpate defendant justifies the denial of a motion for inspection that does not make some particularized showing of materiality and usefulness." United States v. Evanchik, 413 F.2d 950, 953 (2d Cir. 1969). The request here was for a known item—tapes of conversations to which one or more defendants were parties; the record below discloses no such particularized showing of need; and as

we have already noted, we have examined the transcript of the tapes and found it to contain nothing that would have been additionally useful to the defense.

### III. THE McCARTHY–O'BRIEN TRANSACTION

Appellants' next argument is that evidence about the fraudulent bank account established with the check of the deceased Mary McCarthy, introduced over their objections, should have been excluded because its probative value was far outweighed by its prejudicial effect. In addition, they object to the Government's introduction of false grand jury testimony by Crisona relating to the transaction and cross-examination in which Crisona repeatedly contradicted that testimony. The Government contends, on the other hand, that the check episode was admissible to show motive for appellants' subsequent conduct, i. e., proceeds from the Sunrise Mountain Corporation fraud were needed and used to pay off the $9,100 overdraft created when the McCarthy check was stopped. Secondly, the Government justifies the introduction of the transaction and Crisona's grand jury testimony about it as relevant to Crisona's credibility.

■ It has been this court's "consistently held position that evidence of similar acts, including other crimes, is admissible for any relevant purpose other than merely to show defendant's bad character." United States v. Johnson, 382 F.2d 280, 281 (2d Cir. 1967). We do not think that the substantial and pressing financial obligation arising from the transaction is of insignificant probative value on the issue of appellants' motivation for their subsequent frauds. Cf. United States v. Kahaner, 317 F.2d 459, 470–472 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963). Nor are we impressed by the magnitude of the prejudicial impact of what appellant Crisona terms "the repulsive tale as to the theft of the dead woman's check" in the context of appellants' numerous other financial misappropriations. Cf. United States v. Bradwell, 388 F.2d 619,

622 (2d Cir.), cert. denied, 393 U.S. 867, 89 S.Ct. 152, 21 L.Ed.2d 135 (1968); United States v. Jordan, 399 F.2d 610, 612–613 (2d Cir.), cert. denied, 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968). Moreover, it was the defendants themselves who, on cross-examination of government witness Neiman, brought out the "repulsive" aspects of the affair —that the check was stolen and that Mary McCarthy was dead. Finally, the trial judge took pains in his instructions to the jury to limit the effect of the evidence. Appellants rely heavily on the decision of this court in United States v. Byrd, 352 F.2d 570 (2d Cir. 1965). But we have made clear that *Byrd* itself only "reiterated that where the pertinent factors have been duly considered, the admissibility of the evidence is a matter in which the trial judge should be allowed a wide range of discretion." United States v. Deaton, 381 F.2d 114, 118 n.3 (2d Cir. 1967). Assessing the "pertinent factors" here involved, we do not think that the trial judge abused his discretion.

### IV. FAILURE TO RULE IN ADVANCE ON DEFENDANTS' CONVICTIONS

■ Appellant John DeLyra contends that the trial judge erred in refusing to make an advance ruling with regard to the admissibility for impeachment purposes of certain prior convictions. During a recess on a Friday near the end of the Government's case, the attorney for both John and Anthony De-Lyra informed the judge that he was "contemplating the possibility" that either or both would testify but that he understood that both had been convicted of crimes 25 or more years before; he requested the court to rule whether it would allow the Government to bring out the convictions if the defendants were to testify. The following Monday the trial judge declined to make such an advance ruling. On appeal, we are told that John DeLyra had been convicted of vagrancy and of petit larceny in 1935, and that

between 1937 and 1940 he was charged with concealment of leased property, for which he was ultimately fined $300.[7] Appellant, relying largely on this court's decision in United States v. Palumbo, 401 F.2d 270 (2d Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969), argues that these ancient and relatively minor convictions should not have been available to the Government to impeach his credibility and that the trial judge had discretion to prevent such use and should have so ruled before appellant decided whether to take the stand.

It is true that *Palumbo* stands for the proposition that a trial judge has discretion to exclude evidence of prior crimes in an appropriate case and to decide to do so in advance of defendant's testifying. However, while such a practice may sometimes be desirable, *Palumbo* does not suggest, as appellant would have us rule, that it is necessarily error for the judge to defer exercising that discretion until the defendant has in fact testified. Indeed, in *Palumbo* itself, we stressed that the trial judge has discretion in this area, see 401 F.2d at 274, and we have subsequently approved a district court's discretionary refusal to make advisory rulings in similar circumstances. See United States v. Evanchik, 413 F.2d 950 (2d Cir. 1969); United States v. Hart, 407 F.2d 1087, 1088–1089 (2d Cir. 1969). Under these circumstances, we hold that there was no abuse of discretion in the trial judge's failure to make an anticipatory ruling.

### V. OBJECTIONS TO JURY INSTRUCTIONS

#### 1. *Charge on intent*

■ Appellant Anthony DeLyra contends that the trial judge, in instructing the jury, failed to make clear that the element of criminal intent must have been proved as to each of the charges beyond a reasonable doubt. In charging on the many different counts, the judge repeatedly included intent or knowledge

7. Anthony DeLyra apparently does not press this claim of error on appeal; in any event, our disposition of it would be the same.

as one of the elements which the Government had to establish beyond a reasonable doubt as to each offense. Immediately after the charge, defense counsel took exception to the court's failure specifically to instruct the jury on the elements of wilfulness and knowledge. Consequently, the judge then gave the supplemental charge:

> Ladies and gentlemen, I am told that in my charge in explaining the counts * * * that I called the wire crimes and travel crimes and the transport-money-by-fraud crimes, I neglected to tell you one of the elements that the government must prove with regard to each defendant accused in those crimes is that he did the act complained of knowingly and wilfully; and that means that he had to have an evil intent at the time of the alleged crime; not something that he did negligently or accidentally but purposefully. In other words, he had a criminal intent when he is alleged to have committed these crimes.

Appellant apparently argues that the court should have again stated that this element of the crime had to be proved beyond a reasonable doubt. In view of the judge's prior instructions, this was unnecessary. Indeed, defendants made no further objection. Cf. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (*en banc*), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

### 2. *Missing witness charge*

■■ Appellant John DeLyra raises as error the trial judge's instruction on missing witnesses. In his summation counsel for Crisona several times called attention to the failure of the Government to summon certain individuals as witnesses; in reply, the prosecuting attorney noted that the defense could have obtained the presence of witnesses by subpoena. In his jury charge, the trial judge commented:

> During summations there was considerable reference to where a certain witness was and to the fact that he wasn't called. In a federal criminal trial both the government and a defendant are entitled to receive from the clerk of the court a subpoena calling for the attendance of a witness, and no matter where the witness lives in the United States, he is required to appear when served with such a subpoena.
>
> Now, X or Y or Z could have been called by either side as a witness, so that from the failure of either side to call him or them you may infer that his or their testimony might have been unfavorable to either the government or to a defendant, but it is equally within your discretion to draw no inference at all from the failure of the government or a defendant to call X or Y or Z.

Appellant argues that allowing the jury to draw an unfavorable inference from his failure to call a witness infringes upon his right to rest upon the Government's burden of proof. But we have long held that it is proper to instruct the jury that "the failure to produce such a witness is open to an inference against either party." United States v. Dibrizzi, 393 F.2d 642, 646 (2d Cir. 1968); see United States v. Evanchik, *supra*, 413 F.2d at 954; United States v. Armone, 363 F.2d 385, 404–05 (2d Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 398, 17 L.Ed. 2d 303 (1966). Additionally, appellant argues that this charge is only permissible where the witness is "equally available" to both sides, that the power to subpoena does not establish "equal availability," and that in fact the witnesses referred to were not "as a practical matter" available to the defendant. We noted in United States v. Armone, *supra*, 363 F.2d at 405, that "[i]f the court had stated that a witness was available who was not, in fact, available, a different picture might have been presented," but defendant made no assertion either below or here on appeal that any specific individual was unavailable to him. Indeed, no exception whatever was taken to the charge, which is sufficient in itself to be dispositive. See United States v. Indiviglio, *supra*. In sum, we find no merit in appellants' objection to the charge.

## VI. IMPROPER JUROR DISCUSSIONS

 Shortly before the charge, counsel for the DeLyras represented to the judge that there had been improper discussions among the jurors. Rose De-Lyra, sister-in-law of the DeLyras, then testified that a few days before she had heard three female jurors discussing the case in the ladies' room and that one of them had said "He's guilty," and another, "If you ask me they're all guilty." Mrs. DeLyra said she could identify with certainty only one of the women and was uncertain who had said what. Counsel for the DeLyras requested an inquiry of the jurors and the trial judge agreed that he would conduct one. Subsequently the judge did confer *in camera* with each of the four female jurors and a female alternate juror, and stated that he was satisfied that there was no basis in fact for Mrs. DeLyra's testimony. On appeal, John DeLyra claims that the judge should have conducted a hearing in open court on the matter with defense counsel present. However, there is no indication that any defense counsel ever requested such a hearing, objected to the judge's course of action, or even took exception to his conclusion. Consequently there is no merit to appellant's contention. See United States v. Kahaner, 317 F.2d 459, 482–483 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74 (1963). Moreover, the procedure adopted by the judge seems to have been reasonable under the circumstances. See Miller v. United States, 403 F.2d 77, 81–82 (2d Cir. 1968); cf. United States v. Woodner, 317 F.2d 649, 651–652 (2d Cir.), cert. denied, 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144 (1963).

## VII. SUFFICIENCY OF THE EVIDENCE AGAINST PARKS

 The main argument of appellant Parks is that the evidence against him was insufficient to support his conviction, and that there was no showing that he knowingly participated in the illegal schemes or had any motive for such a participation. Taking the evidence, as we must, from the view most favorable to the Government, we find sufficient grounds on which the jury could reasonably have reached its conclusion as to appellant's guilt. To summarize the most important facts: Parks was present at meetings among the conspirators at which the details of the scheme were planned and carried out; he received substantial shares of the proceeds of fraudulently obtained advance fees; he presented himself, or was presented, to various victims under aliases and in false capacities and made a variety of misrepresentations to these victims about Columbia Resources. In the light of his intimate and prolonged connection with the other defendants and their illegal enterprise it is not surprising that the jury found unpersuasive his assertion that he was merely an innocent dupe.

Parks raises a second claim of error relating to an allegedly prejudicial line of questioning by the trial judge about certain written appraisal records, but we find it wholly without merit.

Judgments affirmed.