**UNITED STATES of America, Plaintiff,**

v.

**Thomas GAMBINO, Defendant.**

**No. CR–90–1051 (S–3).**

United States District Court,
E.D. New York.

Oct. 26, 1993.

Laura A. Ward, Geoffrey Mearns, Asst. U.S. Attys., Brooklyn, NY, for plaintiff.

Michael Rosen, New York City (Judd Burstein, Gerald L. Shargel, Shargel & Futerfas, New York City, of counsel), for defendant.

Jay Goldberg, New York City.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

The defendant was convicted upon a trial by jury of Racketeering, in violation of 18 U.S.C. § 1962(c) (Count One), the predicate acts of racketeering for which were violations of 18 U.S.C. § 1955 (illegal gambling business); 18 U.S.C. §§ 892 and 894 (extortionate extensions and collections of credit); 18 U.S.C. § 1952 (interstate travel and communication incident to illegal gambling and loan-sharking), and of Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d) (Count Two). His co-defendant, Giuseppe Gambino, was acquitted on both counts. Jury selection commenced on April 19, 1993 and a verdict was rendered on May 11, 1993. The proceedings are recorded in a transcript of approximately 1700 pages.

The defendant thereafter moved this court for a new trial pursuant to Rule 33, Fed. R.Crim.P. His motion is bottomed upon two grounds: (1) the failure of the government to disclose that Salvatore Gravano perjured himself concerning his personal involvement in narcotics trafficking, and (2) the verdict was against the weight of the evidence.

As regards the first basis of his motion, he contends that "this is a case which hinged upon the credibility of Salvatore Gravano." Memorandum of Law in Support of Defendant's Motion for a New Trial ("Def's Mem." at 2). In furtherance of that contention, he asserts that the "heart of the defense were the claims that (a) Gravano had lied about perhaps the most crucial event in the case—an alleged meeting with Thomas Gambino to discuss Anthony Megale's guilty plea—and (b) that the government was covering up for him." This assertion is elaborated by alluding to the government's reference to Gravano's cooperation agreement, the continued efficacy of which was conditioned upon his truthfulness and to Gravano's testimony two weeks previously in another trial in the Southern District of New York in which, the defendant claims, Gravano lied under oath.

Prior to discussing the legal underpinnings of the defendant's motion, it would be useful to make a factual assessment of the defendant's averment that his case "hinged upon the credibility of Salvatore Gravano," that his testimony "was, as a functional matter, the *sine qua non* of the government's cases" and that it is "the only way to harmonize Thomas Gambino's conviction and Giuseppe Gambino's acquittal" (Def's Mem. at 3).

Prior to making that assessment, however, it is vital to note and remember that the defendant, Thomas Gambino, was indicted in December, 1990 together with Salvatore Gravano, John Gotti and Frank Locascio. The charges against the defendant in that indictment, from which he was eventually severed, are virtually identical to the charges in the superseding indictment on which he was tried and convicted. Had the defendant not been severed and had Gravano not elected to cooperate with the government, the defendant would have been tried together with Gravano and the other co-defendants.

*I*

The first significant evidentiary reference to the defendant was presented by the government in an intercepted and recorded conversation between John Gotti and George Remini on January 17, 1986 in the Bergin Hunt and Fish Club. George Gabriel, a Special Agent of the F.B.I. testified regarding that conversation. Agent Gabriel has been assigned to the Gambino Squad of the F.B.I. since 1985 and was qualified as an expert witness on organized crime families, their structure, methods, means of operation and on the terminology used by members of organized crime families. He identified John Gotti as the Boss of the Gambino Organized Crime Family (Tr. at 194), George Remini as a made member in that family (Tr. at 203), Tommy DeBrizzi as an acting captain in the Gambino Family (Tr. at 206) and Tommy Bilotti as the underboss of the Gambino Family (Tr. at 209). During the course of that conversation Gotti informed Remini that the defendant sent for DeBrizzi on three occasions and DeBrizzi never came, explaining his failure to do so by having been given discretion by Tommy Bilotti to respond or not to the defendant's summons (Tr. at 208–09). Gotti went on to say that he will have the defendant handle the problem with De-Brizzi (Tr. at 211). Of particular significance is Gotti's statement to DeBrizzi that the defendant's people, (Phil Loscalzo and the co-defendant, Giuseppe Gambino) (sometimes referred to hereafter as Joe Gambino) are helping him run DeBrizzi's operation in Connecticut (Tr. at 212) and that he would demote DeBrizzi from an acting captain to soldier and assign him to the defendant. (Tr. at 217–18). Other attributions to Gotti in the conversation as testified to by Agent Gabriel make it plain that the defendant Thomas Gambino was a captain in the Gambino Family (Tr. at 222–24), and photographs received in evidence depict persons identified as De-Brizzi (GX 902–A); Giuseppe Gambino (GX 902–B and C); George Remini, Phil Loscalzo and the defendant (GX 902–D and E); George Remini and the defendant (GX 902–F and G) and Anthony Megale (GX 902–H). (Tr. at 226–28). These photographs were taken on January 22, 1986 on Bogart Avenue in the Bronx, N.Y. (Tr. at 226–27). There are approximately four passing references to acquitted co-defendant Giuseppe Gambino on that recorded conversation compared to approximately three times as many to the defendant Thomas Gambino which are of more than passing significance.

The government also introduced an intercepted and recorded conversation in which the participants were John Gotti, Frank Locascio and Salvatore Gravano on January 4, 1990 in an apartment above the Ravenite Club at 247 Mulberry Street in New York City (Tr. at 229). Agent Gabriel explained a reference to one Pietro Angelo and Tommy Gambino as signifying that Angelo, deceased in 1985, was a member of this defendant's crew. (Tr. at 255–57, 261). As the conversation continued and the names of many others were mentioned in a variety of contexts, one Carmine Sciandra was identified as a member of Tommy Gambino's crew (Tr. at 279) and Tommy Gambino was described as laughing when Gotti admonished lawyers (Tr. at 284). Not once during the playing of this recorded conversation was the name of Giuseppe Gambino mentioned.

An intercepted and recorded conversation in an apartment above the Ravenite Club on January 17, 1990 was played. Among the participants heard on this recording were Gotti, Locascio, Gravano and Joseph ("Joe Butch") Corrao. In the course of this conversation Gotti is heard to declare that Tommy Gambino is a "skipper," meaning a captain in the Gambino Family. (Tr. at 116, 289). Not once during the playing of this recorded conversation was the name of Giuseppe Gambino mentioned.

A conversation among Gotti, Gravano and Locascio on November 30, 1989 in the apartment above the Ravenite which was intercepted and recorded was played for the jury. On that recording, Gotti is overheard relating a conversation at which Thomas Gambino was present in which accusations were voiced against Neil Dellacroce, a captain in the Gambino Family (Tr. at 307) and in which he related a stated intention of Paul Castellano to put "young soldiers" . . . "in the crews of Tommy Gambino and Joe Butch Corrao." (Tr. at 309). Not once during the playing of

this recorded conversation was the name of Giuseppe Gambino mentioned.

A conversation between Gotti and Giuseppe Gambino in the hallway of 247 Mulberry Street on December 14, 1989 was intercepted, recorded and played for the jury. The subject of the conversation was the need to provide a lawyer for Tony Megale who was indicted in Connecticut on December 6, 1989 and arrested on the following day, the expenses a trial would entail, and who would provide for payment of those expenses. (Tr. at 324–26).

Five days later, on December 19, 1989, a conversation between Gotti and Thomas Gambino in that same hallway was intercepted, recorded and played for the jury. The discussion once again centered about the representation of Tony Megale. (Tr. at 327). The testimony of Agent Gabriel regarding that conversation would have permitted the jury to find that Tommy Gambino was going to pay for the services of Tony Megale's lawyer (Tr. at 328, 332); that Tommy Gambino was involved with loansharking (Tr. at 329); that Tommy Gambino was the captain of a crew of which Giuseppe Gambino was a member (Tr. at 330); that Tommy Gambino was keeping Gotti apprised of the events surrounding the indictment of Tony Megale (Tr. at 333); that he pledged his fealty to John Gotti (Tr. at 335, 336); and that Gotti was pleased that Tommy Gambino was available to assist Tony Megale (Tr. at 336).

After the recorded conversations were played for the jury, the government then presented surveillances of the activity in the vicinity of the Ravenite Social Club which were captured on video tape. Thomas Gambino was shown entering and leaving that club on December 19, 1989 and Giuseppe Gambino was then shown on December 14 and 19, 1989.

The cross-examination of Agent Gabriel established that he was never told that Giuseppe Gambino was ever seen at any gambling operation in Connecticut, nor had he ever been told that Giuseppe Gambino was the recipient of a delivery of money in Connecticut (Tr. at 458–60); that he was involved in money lending (Tr. at 426–32, 442–44); or that he was ever mentioned in any conversation emanating from the Connecticut gambling operation. (Tr. at 431). The cross-examination also revealed that there was no evidence that Tony Megale ever gave any money to Giuseppe Gambino (Tr. at 435); that he was never mentioned in any conversation intercepted in the home of Paul Castellano as being involved in Connecticut gambling or loansharking (Tr. at 437); there was no evidence that Giuseppe Gambino ever delivered any money to John Gotti (Tr. at 442–43); Salvatore Gravano was never overheard to say that Giuseppe Gambino delivered money to Gotti from Connecticut gambling or loansharking operations (Tr. at 444); there was no evidence that Giuseppe Gambino ever gave any money to Megale's lawyer (Tr. at 473); and he was never heard in any conversations regarding Megale's plea (Tr. 480–81).

Salvatore Gravano was the next witness called to testify for the government. He identified the defendant as a captain in the Gambino Family (Tr. at 599, 610); George Remini as his acting captain (Tr. at 612); Skinny Phil, Carmine Sciandra, Petey Castellano, Sal (LNU), Tony Megale, Giuseppe Gambino and Tommy DeBrizzi as members of the defendant's crew (Tr. at 613, 615, 641). He testified that the defendant was involved in running the Connecticut faction of the Family through Tony Megale (Tr. at 644) who he saw at the Ravenite a few times with the defendant and Giuseppe Gambino. (Tr. at 645). That faction was involved in gambling, loansharking and labor racketeering. (Tr. at 645). He never saw Megale turn in any money to any member of the Gambino family and if Megale ever did, Gravano didn't know to whom. (Tr. at 647–48). In accordance with Family protocol, each captain, including the defendant, contributed $3,000 as a Christmas present for John Gotti. (Tr. at 648). Gravano never received any money from Giuseppe Gambino in connection with Connecticut gambling or loansharking and did not know whether Giuseppe Gambino was involved in any way in those Connecticut activities. (Tr. at 648–49).

After the arrest and indictment of Tony Megale, he discussed pleading guilty with the defendant, who then presented that possibility to Gotti. Gotti's permission to plead

guilty was transmitted to Megale through the defendant. (Tr. at 651–52).

Cross-examination elicited from Gravano that Gotti never discussed with him the receipt of monies from Connecticut and never told him he was receiving money from Giuseppe Gambino (Tr. at 676–77, 680); that Gravano never received money from Giuseppe Gambino (Tr. at 679); that Gotti never told him that the defendant or Giuseppe Gambino was to bring in a specified weekly sum from Connecticut gambling and loansharking (Tr. at 680–81, 684–85); that neither Angelo Ruggiero nor Joe Piney ever told him (Gravano) that the defendant or Giuseppe Gambino ever delivered money to John Gotti from Connecticut gambling and money lending. (Tr. at 682).

Counsel then embarked upon a course of a vigorous, aggressive and methodical impeachment in which virtually every crime and every wrongful act committed by the witness was minutely dissected and laid before the jury over a period of two days and approximately 150 pages of transcript. Included in that cross-examination was the fact that at a time when Gravano had previously testified he met with the defendant in New York concerning the Megale plea, he was, in fact, on vacation in Puerto Rico. (Tr. at 838–44). The redirect and recross-examination of this witness added little of substantive value to what has been outlined above.

Joseph L. Sheridan, a Special Agent of the FBI, testified as to the significance of terms used and the identity of persons referred to during a tape-recorded conversation between William Lepore, a confidential informant who was wired, and Aurelio Carmolingo, an associate of the Gambino Family and a Connecticut loanshark. (Tr. at 897). A person identified by Agent Sheridan as Tommy DeBrizzi, in charge of the Connecticut faction of the Gambino Family, was referred to in that conversation. (Tr. at 904). Also referred to was a person identified by Agent Sheridan as Tony Megale who succeeded Tommy DeBrizzi and who was said to be affiliated with the Gambino Family in New York. (Tr. at 919). Throughout that conversation, references were made to gambling and shylocking activity of Carmolingo and others associated with

the Gambino Family. There were no references to either Thomas or Giuseppe Gambino or any of the recorded conversations and Agent Sheridan testified that neither Thomas nor Giuseppe Gambino were seen during the course of surveillances. (Tr. at 941).

Michael Sairius, a retired Connecticut State Police detective, testified as an expert on gambling. He explained the meaning of gambling terms used during the course of telephone conversations between a bookmaking establishment and bettors; the mechanics of bookmaking; and the fact that Tony Megale's voice was intercepted on some of those recorded conversations. (Tr. at 1072).

That there was a relationship between Tommy DeBrizzi, Tony Megale, Frank Piccolo (DeBrizzi's predecessor in charge of the Connecticut faction of the Gambino Family) and others and John Gotti was established through the testimony of FBI Special Agents Paul Hayes, Jr., and John Schiman. (Tr. at 1073–85).

Special Agent Eugene McCarthy testified to surveilling Tony Megale on March 22, 1989 from Stamford, Connecticut, to the Cafe Cappuccino on Morris Avenue in the Bronx, to the Dynamic Delivery Corporation warehouse on West 24th Street in Manhattan. (Tr. at 1087–89). The Cafe Cappuccino was the place where Phil Loscalzo "did most of his business . . . almost on a daily basis." (Tr. at 1175). The defendant Thomas Gambino had an interest in the Dynamic Delivery Corporation. (Tr. at 1176). Cross-examination elicited that during the course of that surveillance Agent McCarthy did not see Giuseppe Gambino.

FBI Special Agent James Riordan testified that while on surveillance on November 14, 1985 he saw Thomas DeBrizzi meet with Tony Megale and Phil Loscalzo in Stamford, Connecticut and did not see Thomas Gambino or Giuseppe Gambino during the course of that surveillance. (Tr. at 1093–97).

FBI Special Agent George Mueller testified that while on surveillance on January 22, 1986, he observed Tommy DeBrizzi emerge from a cafe with Giuseppe Gambino on Morris Park Avenue in the Bronx and enter the premises at 1803 Bogart Avenue which was

within walking distance from the cafe. (Tr. at 1100). Approximately two hours later, DeBrizzi was observed leaving 1803 Bogard Avenue and approximately twenty minutes after that Thomas Gambino and Phil Loscalzo were seen leaving the Bogart Avenue address. (Tr. at 1102–03). Photographs of the persons mentioned were taken on that occasion and received in evidence as GX 902A–H. On March 22, 1989, approximately three years later, Agent Mueller testified that he surveilled Tony Megale from Stamford, Connecticut to the Cafe Cappuccino in the Bronx where he photographed Tony Megale with Phil Loscalzo and then followed Tony Megale to a point near Dynamic Delivery in Manhattan. (Tr. at 1105–07).

FBI Special Agent Milo Dowling, the Case Agent for this case, testified on behalf of the government. He testified that on May 3, 1989 he followed Tony Megale from Cos Cob, Connecticut to West 35th Street in Manhattan and together with others, executed a search warrant authorizing a search of Megale and his vehicle. Agent Dowling also described the articles found on Megale's person. (Tr. at 1153–55). Agent Dowling then testified to specific dates and to events occurring on those dates which were of more than passing relevance to the government's theory of the case and to the entire mosaic of evidence with which these isolated pieces of testimony fit. For example, Thomas Gambino was observed at the Ravenite Social Club on April 17, 1990, the day on which Tony Megale pleaded guilty in the federal court in Connecticut. (Tr. at 1159). Between April 17 and April 21, 1990 (the date on which John Gotti, Jr. was married), there were no observations of Thomas Gambino at the Ravenite. He was next observed there on April 24 and again on April 26 and 27. (Tr. at 1160–61). This was the only week in three years of video surveillance in which Thomas Gambino was seen at the Ravenite on three separate days. (Tr. at 1168). Tony Megale had moved to withdraw his plea on April 25 and his motion was denied on April 30. (Tr. at 1161). The particular significance of the foregoing is that Gravano had previously testified that he met with Gotti and Thomas Gambino regarding the Megale plea at the Ravenite on April 18 which was questionable

given the absence of an observation of Thomas Gambino at the Ravenite between April 17 and April 21. Agent Dowling became aware of the discrepancy while compiling a summary chart based upon videotaped surveillance depicting persons seen at the Ravenite on given dates. (Tr. at 1163). He never called the discrepancy to the attention of Gravano and to his knowledge, Gravano himself first became aware of the discrepancy when confronted with it upon cross-examination by the defendant's counsel. (Tr. at 1164). It is also particularly significant to note that the summary chart from which the discrepancy became apparent was provided to the defense approximately one week prior to the commencement of the trial. (Tr. at 1163).

Another summary chart reflecting telephone records of Anthony Megale for the years 1985–1990 was received in evidence. (Tr. 172–73). Agent Dowling testified that those records revealed a number of calls to the residence of Giuseppe Gambino; to and from the Romeo Cafe in the Bronx where Giuseppe Gambino was frequently found; to the residence of Phil Loscalzo; to and from the Cafe Cappuccino in the Bronx where Loscalzo was frequently found; to Consolidated Carriers on West 35th Street in Manhattan, a company in which Thomas Gambino has an interest (Tr. at 1173–76, 1181); calls billed to Megale's home from a grocery store three doors removed from the Ravenite Social Club on days when Megale was also observed at that club (Tr. at 1179–80); calls from Bridgeport, Connecticut to the office of Paul Victor, Megale's lawyer in New York City and to Consolidated Carriers on April 23, 1990, the day on which the transcript of Megale's guilty plea was filed (Tr. at 1182–84); calls from Stamford, Connecticut to Paul Victor and to Consolidated Carriers on April 30, 1990, the day on which Megale's motion to withdraw his plea was filed.

Videotaped surveillances of the Ravenite Club were received in evidence and played. Agent Dowling identified the persons captured on those videotapes. (Tr. 1189–1213). Reference will be made to a selected few of the events depicted. On October 27, 1988 the defendant and Gravano leave the Raven-

ite and engage in conversation for approximately thirty-five minutes. (Tr. at 1192). On the day Tony Megale pleaded guilty, Thomas Gambino arrived at the Ravenite and was seen later on leaving with John Gotti and others. (Tr. at 1203). On April 24, 1990, the day before Megale filed his motion to withdraw his plea, Thomas Gambino and Gravano enter the Ravenite and thereafter Gambino is seen leaving with John Gotti. (Tr. at 1205). On April 26, 1990, the day after the motion to withdraw the plea is filed, Thomas Gambino, Gotti and Gravano are again captured in a walk-talk. On May 3, 1990, after Megale's motion to withdraw his plea was denied, Thomas Gambino and John Gotti are shown again walking and talking. Shortly thereafter, Thomas Gambino is again walking and talking with one Vinnie Aloi, described as a member of the Colombo Organized Crime Family. Giuseppe Gambino is also at the Ravenite on that day conversing with Thomas Gambino and Frank Locascio outside the Ravenite Club. (Tr. at 1210–11). On May 10, 1990, the videotape depicts Giuseppe Gambino and Tony Megale entering and exiting the Ravenite Club and on May 14, Thomas Gambino is shown exiting the Club with John Gotti. (Tr. at 1212).

Counsel for Thomas Gambino cross-examined Agent Dowling about the inconsistency concerning the date on which Gravano showed Thomas Gambino a newspaper article reporting the guilty plea of Tony Megale and discussing that plea with him. (Tr. at 1218–24, 1265–66). Cross-examination also elicited that Tony Megale was at the Ravenite Club on many occasions when Thomas Gambino was not observed there. (Tr. 1228–34). Cross-examination also elicited the many phone calls Tony Megale made from his cousin's restaurant located a few blocks from the Ravenite Club. (Tr. at 1251–58). Agent Dowling testified, in response to questions put to him on cross-examination, that he did not have a recorded conversation in which Tommy Gambino was discussing Connecticut gambling with Tony Megale or in which he is heard directing Megale to come to New York. (Tr. at 1262).

Agent Dowling was cross-examined vigorously, as well, by counsel for Giuseppe Gam-

bino concerning the date of the discussion between Gravano and Thomas Gambino about the newspaper article reporting the guilty plea of Tony Megale. (Tr. at 1267–77). That cross-examination elicited that Agent Dowling had no knowledge that Giuseppe Gambino was present in the Romeo Cafe on the occasions when Agent Dowling testified telephone calls were made from that Cafe to Tony Megale (Tr. at 1283), nor did Agent Dowling know whether the telephone calls from Tony Megale's telephone to Giuseppe Gambino's telephone were between Mrs. Megale and Mrs. Gambino. (Tr. at 1282). Agent Dowling never saw Tony Megale deliver anything to Giuseppe Gambino nor did he ever see Giuseppe Gambino deliver anything to Salvatore Gravano. (Tr. at 1285).

This detailed account, assessed objectively, belies the dogmatic assertion that the case stood or fell upon the credibility of Salvatore Gravano and that it was his credibility which alone accounted for the defendant's conviction and his co-defendant's acquittal. Gravano's direct testimony explicitly linking the defendant to the Connecticut faction of the Gambino Family was only as follows:

Q. After DeBrizzi was killed, who took over management of the Connecticut faction?

A. When Tommy Gambino was involved in running the Connecticut faction, there was Tony Megale who basically took direct control of it in answer to Tommy Gambino.

(Tr. at 643–44)

Beyond that, Gravano's only testimony linking the defendant to the Connecticut faction is reflected in this snippet of direct and re-direct testimony:

Q. Did Tony Megale subsequently plead guilty?

A. Yes, he did.

Q. What happened as a result of Tony Megale's plea?

A. It was in the papers that he admitted being a made member, that he was controlling the Gambino interest in Connecticut.

We found out. John Gotti and myself were sitting there. I believe Frank Lo-

cascio came in, who was our acting consigliere, with the newspaper, put it on the table. John read it, handed it over to me. I read it and shortly after that, Tommy Gambino came in and told us that he read the article. We gave him the article. He said he read it. He said if it was so, which he didn't believe it to be so, he would make him withdraw the plea.

Q. That Thomas Gambino would make Tony Megale withdraw the plea?

A. Yes.

Q. What happened next?

A. He tried to withdraw the plea.

(Tr. at 652).

On redirect examination:

Q. For several years prior to Tony Megale, Tommy Gambino was also responsible for the operation in Connecticut, is that fair to say?

A. Yes.

(Tr. at 865–66).

As has been previously outlined, that recounted event was the subject of much inquiry which established that it did not occur on the date testified to by Gravano, but, nevertheless permitted the jury to find that he was mistaken as to the date but not as to the occurrence. (Tr. at 1290–91). Gravano's direct testimony pertaining to Joe Gambino in this connection is reflected in the transcript as follows:

Q. Do you know *whether or not he* [Joe Gambino] was involved in any way in the Connecticut gambling and loansharking operation?

 \* \* \* \* \* \*

A. No.

(Tr. at 648–49) (emphasis added).

A plain reading of the few lines can only be understood as conveying that Salvatore Gravano did not know whether Joe Gambino *was or was not* involved in Connecticut gambling and loansharking.

Those few lines from a transcript of approximately 1700 pages represent the direct testimony of Gravano linking the defendant to the Connecticut faction of the Gambino Family. He disclaimed any knowledge of any of the details of that linkage as his cross-examination made clear and as is reflected in the following salient portions:

Q. Did John Gotti ever send a message to you and say to you, you know, Sammy, Joe Gambino is someone who is supposed to bring down $1600 a week from Connecticut gambling and money lending? Never said that in any message to you, correct?

A. Correct.

Q. And he never said that to you in any message with respect to Tom Gambino?

A. As far as Connecticut gambling?

Q. That's what we are talking about, Connecticut gambling, Connecticut money lending, do you understand that, that's the only thing I'm asking you about. Did John Gotti ever say to you, by way of any message sent from the prison while you ran the family, that Tom Gambino was to bring down $1600 a week from Connecticut gambling and money lending?

A. No.

 \* \* \* \* \* \*

Q. If I got it, then I say to you, sir, during the period of time that you ran this family, the man in charge, am I correct, when I say neither John Gotti nor any single person ever said to you that Joe Gambino or Tom Gambino was responsible, was assigned the responsibility of bringing money from Connecticut gambling and Connecticut money lending, correct, Mr. Gravano?

A. Not to me, no.

Q. So, I am correct, am I not, that no one ever said that to you, the man in charge, whether it be Gotti or any other of these—I think it's been described as 250 made people and a thousand associates, so 1250 people plus Mr. Gotti, that's 1251 people, no one ever said that to you?

A. I don't talk to 1251 people.

Q. Whoever you spoke to?

A. The committee we ran the family with didn't speak to me about it.

Q. Nobody said it, right?

A. Not the committee, no.

Q. Let me ask something. Part of the people who comprised the trio who ran the family during Mr. Gotti's absence, was not only yourself, but I have averted [sic] to the name Joe Piney, correct, he was a member?

A. Yes.

Q. Of this commission, what is it called?

A. The Committee.

Q. The Committee. And Angelo Ruggiero was a member of the Committee. Is that right?

A. Yes.

Q. Am I correct when I say that neither Angelo Ruggiero or Joe Piney ever said to you, Sammy, we are supposed to get $1600 a week from Connecticut gambling and money lending; am I correct?

A. No one ever told me that.

Q. And in fact neither Joe Piney nor Angelo Ruggiero ever said to you that my client, Joe Gambino, or Tom Gambino, had ever in their lifetime delivered any monies to John Gotti from Connecticut gambling and Connecticut money lending, specific crimes charged here?

A. I was never told that, no.

(Tr. at 680–83).

The defendant's assertion that were it not for those brief exchanges, he would not have been convicted ignores a mass of other evidence which would have compelled a denial of a motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure even if Gravano had not testified at all. The tape recorded conversation between John Gotti and George Remini on January 17, 1986 which the jury heard and about which Agent Gabriel testified confirmed the defendant's status as a Captain in the Gambino Family out of the mouth of John Gotti as did the tape recorded conversations of January 4, 1990 and January 17, 1990 which also identified members of the defendant's crew. The tape recorded conversation between John Gotti and the defendant on December 19, 1989 about which Agent Gabriel testified confirmed the assumption by the defendant of responsibility for Tony Megale's legal fees.

The frequency with which the defendant was videotaped at the Ravenite Club and the walk-talks he had with John Gotti and Salvatore Gravano; the surveillance of Megale in the area of Dynamic Delivery and Consolidated Carriers, in each of which the defendant had an interest; phone calls from Megale to Consolidated Carriers; the phone call from Consolidated Carriers to the hotel adjacent to the federal courthouse in Bridgeport, Connecticut on the day on which Megale's plea of guilty was filed and a mass of similar circumstantial evidence from which inculpatory inferences could have been and obviously were drawn, sufficed to explain the jury's verdict of guilt as to the defendant. The defendant's assertion that the outcome of this case rested upon the jury's acceptance of Gravano's testimony about a meeting he had with the defendant to discuss Tony Megale's guilty plea is hardly persuasive for a variety of reasons. First, as has already been stated, the evidence of the defendant's guilt absent Gravano's testimony was more than sufficient to justify the jury's verdict. Second, the jury had ample bases to conclude that Gravano did in fact meet with the defendant as he testified but was mistaken as to the date of that meeting. Third, the vigorous, extensive and impeachment cross-examination of Gravano, by skilled counsel, placed his credibility squarely before the jury. Indeed, in the Defendant's Memorandum, at page 6, he concedes "[d]espite vigorous cross-examination, they found him credible . . . ." It is interesting to note that in his summation, counsel for Giuseppe Gambino urged upon the jury Gravano's credibility in disclaiming any knowledge about his client's involvement in Connecticut gambling and loansharking.

He argued to the jury as follows:

Will you please favor me by turning to page 649. It's true Mr. Mearns asked this question, but he knew, Mr. Mearns did, that I would be standing to cross-examine in a moment. And what did Salvatore Gravano say?

Question: Do you know whether or not he, Joe Gambino, who is who Mr. Mearns is talking about, was involved and do you see this modification, do you know whether Joe Gambino was involved in any way in the

Connecticut gambling and loan-sharking operation? [1]

\* \* \* \* \* \*

Joe Gambino was not involved in Connecticut gambling or Connecticut loan-sharking. [2]

Now, whatever one says about Salvatore Gravano it is crystal clear that the role he played was such in this enterprise if Joe Gambino was involved in Connecticut money lending and loan-sharking Salvatore Gravano would know it.

\* \* \* \* \* \*

And between the period May, 1986 to April of 1987, he ran this family. He ran this enterprise. This was an enterprise concerned not with social events this was an enterprise concerned with money, making money, collecting money. Gravano ran the family. He ran the day to date [sic] operations of this family when John Gotti was in jail for one full year. He was part of the administration, the top three people in this family. For a whole year when Gotti was sitting in the can, while he ran the family with two other[s], John Armone, Piney, and Angelo Ruggiero one of them was in jail, the other one was preparing for a case and Gravano says he was the person in charge.

\* \* \* \* \* \*

He is in a position obviously to know who has responsibility for making money, who has responsibility for delivering money, what the operations of the family are, and what does he tell you? Joe Gambino to his knowledge never had any responsibility with respect to Connecticut gambling and money lending. [3]

I am going to ask you if you will turn to the next series of pages. I am not going to make you or request you read it but from 677 until 684.

In detail, Mr. Gravano was asked, sir, during the five years that you were part of the administration of this family, did anybody, John Gotti, Joe Armone, Angelo Ruggiero, any human being on the face of this earth say, suggest, intimate that Joe Gambino was connected to Connecticut gambling and loan-sharking? And his answer was no.

Did Gotti ever say to you that Joe Gambino had one role to play in Connecticut gambling and loan-sharking? No was his answer.

When Mr. Gotti was in jail, messages were received by you with respect to the collection of monies and the running of the family, was any message received from Mr. Gotti, Mr. Armone or Mr. Ruggiero to the effect Joe Gambino had one solitary role to play in the operation of Connecticut gambling and Connecticut loan-sharking? And the answer was no.

Does this man know, Gravano, about the affairs of Connecticut gambling, and Connecticut loan-sharking? Not only as I say was he a part of the administration for five years, but he and he alone pleaded guilty to supervising, managing, directing, and controlling Connecticut gambling and Connecticut loan-sharking.

Do you understand how important that is?

\* \* \* \* \* \*

He pleaded guilty on December 5, 1991 in this courtroom to supervising, managing, directing, controlling, financing Connecticut gambling and Connecticut money lending. Who better than Salvatore Gravano would know who was or was not involved in an enterprise, specific criminal act that he had pleaded guilty to, that he was in-

---

1. An examination of page 648 of the official transcript of this trial reveals that the question put to Mr. Gravano was as stated above, namely:

 Q. Do you know *whether or not* he was involved in any way in the Connecticut gambling and loansharking operation?
 The answer appears on page 649 of that transcript:

 A. No.
 There is no "modification" on page 649..

2. This statement, intended to recite Gravano's response to Mr. Mearns' question, misstates that response as f.n. 1 makes clear.

3. See, *supra,* as regards the inaccuracy of this statement.

volved in? And yet he said, Joe Gambino was not involved.[4]

That is a very, very difficult burden for this government to overcome.

Really, when that happened, it would be like the floor of an elevator coming out. I mean, think about it. The man who ran the family and was in charge of Connecticut gambling and money lending tells you ladies and gentlemen of the jury to your face, Joe Gambino had no role to play in it. He was not involved quote in any way close quote in Connecticut gambling. What more do you want?

\* \* \* \* \* \*

Not to burden you by having to read once again Gravano testimony, Gravano has maintained from day one that Joe Gambino was not involved quote in any way in Connecticut gambling and money lending.[5]

Tr. at 1540–47.

It would be idle to speculate as to the reasons for the acquittal of his co-defendant. Surely, to ascribe that result entirely to Gravano's ignorance as to "whether or not" the co-defendant was involved, is sheer sophistry. Suffice it to say that the references to him on intercepted conversations which were, for the most part, oblique, and the fleeting glimpses of him captured on videotape and photographs were *de minimis* in comparison to those of the defendant.

## II

■ A consideration of the bases for the motion for a new trial pursuant to Rule 33, Fed.R.Crim.P., and the legal principles which must inform the determination of that motion will follow. At the outset it is important to note that the alleged perjury of Gravano is not claimed to have occurred during this trial. Rather, the defendant's assertion is predicated upon testimony given by Gravano in another criminal case tried in the Southern District of New York and upon a letter dated May 12, 1993 written by an Assistant United States Attorney in yet another criminal case pending in this court. In essence, the defendant claims that Gravano testified inconsistently about his own involvement in narcotics, and that the government was aware of that inconsistency and failed to disclose it to the defendant, thus depriving him of impeachment material. The reliance by the defendant upon cases such as *United States v. Wallach*, 935 F.2d 445 (2d Cir.1991) *on remand*, 788 F.Supp. 739 (S.D.N.Y.), *aff'd*, 979 F.2d 912 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993); *United States v. Stofsky*, 527 F.2d 237 (2d Cir.1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976) and *United States v. Seijo*, 514 F.2d 1357 (2d Cir.1975), *appeal after remand*, 537 F.2d 694 (2d Cir. 1976), *cert. denied*, 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977), is misplaced. Those cases addressed the appropriate remedial response where a principal government witness commits perjury during the course of the trial. That is not this case. The defendant here seeks this court's remedial response to impeachment material he claims the government withheld. That response is informed by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny.

■ An analysis of the issue will then begin with *Brady*. Brady testified on his own behalf at trial. He admitted his participation in the murder for which he was indicted but claimed that a co-defendant, Boblet, did the actual killing. He requested the jury to return a verdict against him "without capital punishment." After Brady was convicted and sentenced to death, he was made aware of an admission by Boblet that he, Boblet, did the actual killing. *Id.* at 84, 83 S.Ct. at 1195. That admission was withheld from Brady by the prosecution. Brady's new trial motion was granted, but restricted to the question of punishment, guilt not being in issue. *Id.* at 84, 83 S.Ct. at 1195. The Court held that the suppression of evidence which, if made available to the defendant would tend to exculpate him or reduce the penalty, violates due process irrespective of the good faith or bad faith of the prosecution. *Id.* at 87, 83 S.Ct. at 1196. The distinction between this case and *Brady* needs no explication

---

4. See f.n. 3, *supra*.

5. Ibid.

beyond simply stating that evidence which would exculpate this defendant was not withheld.

The next case of significance was *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), in which the government failed to disclose an alleged promise to its key witness that he would not be prosecuted if he testified for the government. The key witness was Giglio's alleged co-conspirator *and the only witness linking Giglio with the crime*. In holding that Giglio was entitled to a new trial, the Court wrote:

> When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within [the *Brady* rule].... We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict...." A finding of materiality of the evidence is required under *Brady* .... A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury...."

*Id.* at 154, 92 S.Ct. at 766 (cites omitted). The Court went on to note that the government's case "depended almost entirely on [the witness's] testimony; *without it there could have been no indictment and no evidence to carry the case to the jury*." *Id.* (emphasis added). That is not this case. The government's case was not at all dependent entirely on Gravano's testimony, as the review of the record described above plainly reveals. It is also important to recall that this defendant was initially indicted together with Gravano, Gotti and Locascio. He was severed from that indictment and the superseding indictment on which he was tried and convicted charges him with essentially the same crimes.

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the defendant was convicted of second-degree murder. The victim died of multiple stab wounds. At the trial, the defendant argued that she acted in self defense. The prosecutor failed to disclose the victim's prior criminal record which reflected two prior convictions of assault and carrying a deadly weapon which, in each case, was a knife. The question presented was whether the failure to provide that information which would have tended to support the defendant's self-defense argument deprived the defendant of a fair trial under *Brady*. The Court held that it did not.

There is much that is instructive in *Agurs* and bears repetition in some detail. To begin, the Court believed it critical to reiterate that a prosecutor does not violate a constitutional duty of disclosure unless that which has not been disclosed is sufficiently significant to deprive the defendant of a fair trial. Information which has not been disclosed does not become "sufficiently significant" or "material" in a constitutional sense because there is a mere possibility that the undisclosed information "might have helped the defense, or might have affected the outcome of the trial.... Nor do we believe the constitutional obligation [of disclosure] is measured by the moral culpability, or the willfulness, of the prosecutor.... If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Id.* at 108–10, 96 S.Ct. at 2395. Continuing, the Court wrote:

> ... [S]ince we have rejected the suggestion that the prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel, we cannot consistently treat every nondisclosure as though it were error. It necessarily follows that the judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless-error standard. Under that standard when error is present in the record, the reviewing judge must set aside the verdict and judgment unless his conviction is sure that the error did not influence the jury or had but very slight effect.... Unless every nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant.

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding

is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* at 111–13, 96 S.Ct. at 2401–02.

Applying that standard, the Court concluded that after reviewing the nondisclosure "in the context of the entire record the trial judge remained convinced of respondent's guilt beyond a reasonable doubt, and since we are satisfied that his firsthand appraisal of the record was thorough and entirely reasonable, we hold that the prosecutor's failure to tender [the victim's] record to the defense did not deprive respondent of a fair trial as guaranteed by the Due Process Clause of the Fifth Amendment." *Id.* at 114, 96 S.Ct. at 2402.

The defendant places great reliance on *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). As is not infrequently the case, the essence of a decision cannot be divorced from the factual setting in which it is crafted. Bagley was indicted on fifteen counts of violating federal narcotics and firearms statutes. The government's *only witnesses* [6] were state law enforcement officers employed as private security guards for a railroad who assisted the federal Bureau of Alcohol, Tobacco and Firearms ("BATF") in an undercover investigation of Bagley. The defendant sought pretrial discovery of any "deals, promises or inducements" made to those witnesses. *Id.* at 670–72, 105 S.Ct. at 3377–78. Among the material supplied in response to that discovery request and pursuant to the Jencks Act,

the government produced a series of affidavits executed by those witnesses in which they stated they received no rewards or promises of reward. Following Bagley's conviction, he learned that BATF had contracted to purchase information from the witnesses about crimes committed by Bagley "and upon the accomplishment of the objective sought to be obtained by the use of such information to the satisfaction of [the government] will pay ... a sum commensurate with services and information rendered." *Id.* at 671, 105 S.Ct. at 3378. Each witness was subsequently paid $300. Bagley then moved to vacate his sentence pursuant to 28 U.S.C. § 2255 alleging the government's failure to disclose the contracts which could have been used to impeach the witnesses violated his right to due process under *Brady.* *Id.* The Court of Appeals for the Ninth Circuit held "that the government's failure to provide requested *Brady* information to Bagley so that he could effectively cross-examine two important government witnesses requires an automatic reversal." *Id.* at 674, 105 S.Ct. at 3379 (quoting *Bagley v. Lumpkin*, 719 F.2d 1462, 1464 (9th Cir.1983)). That holding was reversed. Although the evidence was used by the defense to impeach the government's witnesses by showing bias or interest, rather than evidence which was exculpatory as in *Brady* and *Agurs*, the Court held that the *Brady* rule embraced impeachment evidence as well as exculpatory evidence. Reiterating the holding in *Agurs* that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial," the Court said that "[i]t remains to determine the standard of materiality applicable to the nondisclosed evidence at issue in this case." *Id.* 473 U.S. at 678, 105 S.Ct. at 3381. That determination was made as follows:

The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a

---

6. See the dissenting opinion by Justices Marshall and Brennan in *Bagley*, 473 U.S. at 685–709, 105 S.Ct. at 3385–97.

probability sufficient to undermine confidence in the outcome.

*Id.* at 682, 105 S.Ct. at 3383.

It is of more than slight significance to note that unlike *Giglio* and *Bagley*, in which impeachment evidence of the *only* government witnesses was not disclosed, Gravano was one of many witnesses (excluding audio and video evidence) and his testimony implicating the defendant consisted of less than a dozen lines in a transcript of approximately 1700 pages. In that crucial respect the cases are plainly distinguishable. Applying the standard of *Bagley*, and upon a review of the entire record, I am driven to conclude that there is no reasonable probability sufficient to undermine confidence in the outcome, that had the evidence been disclosed the result of the proceeding would have been different.

That conclusion makes it superfluous, perhaps, to reemphasize the surgical precision with which Gravano's plea agreement with the government and his criminal past were dissected and laid before the jury on cross-examination—a criminal past which included nineteen murders, labor racketeering, extortion, shylocking, obstruction of justice and gambling. The significance of that vigorous attack with a view towards utterly impeaching him is illustrated in many cases of which *United States v. Gilbert*, 668 F.2d 94 (2d Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982) and *United States v. White*, 972 F.2d 16 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992) are peculiarly apt.

In *Gilbert*, the defendant appealed from a denial of his motion for a new trial pursuant to Rule 33, Fed.R.Crim.P., after information impeaching one Couri, a government witness, became known. After reciting the oft-stated principles that such motions are not favored and that the new evidence must be such as to probably lead to an acquittal, the court wrote, at page 96:

> Couri's credibility had already been attacked at trial. Cross-examination had probed his plea agreement with the Government by which he had been permitted to plead guilty.... He was also shown to have submitted a false affidavit to a state court in unrelated civil litigation. The new

evidence of his misdeeds ... was merely "*additional* evidence tending *further* to impeach the credibility of a witness whose character had already been shown to be questionable," *United States v. Rosner*, 516 F.2d 269, 273–74 (2d Cir.1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976) (emphasis in original); it could hardly have transformed the jury's image of Couri from paragon to knave.

In *White*, the defendant appealed from the denial of his motion pursuant to Rule 33 for a new trial based on the ground of newly discovered evidence that the government's *key* witness perjured himself. In affirming the denial of his motion, the court said:

> ... [C]onsideration must also be given to whether the newly discovered evidence is cumulative, that is simply additional evidence to that which was presented at trial as to a fact, or unique evidence that tends to prove a fact at issue.... The evidence questioning the general credibility of Harry Smith was clearly cumulative. As recited by the district court:
>
>> Smith was aggressively cross-examined by the defendant's lawyer, who relentlessly attacked Smith's credibility, called him a liar, and emphasized his lack of veracity in the past. He was shown to be a drug abuser, a narcotics profiteer in the $1 million range, and a convicted felon looking for a way to avoid a long prison sentence.
>
> Since Mincey's testimony would have been admissible only for the purpose of showing that Smith lied about his drug use, *a collateral fact that would simply affect the general credibility of Smith and was not evidence that he was lying as to a particular fact about the crime*, the evidence was cumulative to other evidence of collateral matters that focused on his credibility.

972 F.2d at 21 (emphasis added) (cites omitted).

The defendant also relies for support for his motion upon cases decided by the United States Court of Appeals for the Second Circuit to which I now turn. Chief among them is *United States v. Wallach*, 935 F.2d 445 (2d Cir.1991), *on remand*, 788 F.Supp. 739

(S.D.N.Y.), *aff'd*, 979 F.2d 912 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993). The opening sentence of the opinion in that case, without more, serves to establish that *Wallach* is inapposite. That sentence reads: "[t]his appeal presents several questions, the dispositive one being whether the *perjured testimony of a key government witness* requires a reversal of the convictions." *Id.* at 449 (emphasis added). The painstakingly detailed review of the evidence in this case which is set out as pages 3–25 of this opinion can leave no doubt that Gravano was *not* the key government witness here nor was the allegedly perjured testimony given here. *Wallach* is also distinguishable in that Guariglia, one of the two witnesses upon whose testimony "the prosecution built its entire case" and whose "testimony was, to say the least, critical to the government ... perjured himself during the course of his testimony at trial." *Id.* at 455. Indeed, "Guariglia was the centerpiece of the government's case." *Id.* at 457. The perjury allegedly committed by Gravano was not during the course of this trial. Indeed, not a single question was put to him on this trial regarding the subject about which he claimed to have perjured himself. The focus of *Wallach*, namely, "[w]hether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury", *id.* at 456, is not relevant here. The testimony of Gravano alleged to be perjured was *not* introduced at this trial.

*United States v. Seijo*, 514 F.2d 1357 (2d Cir.1975), *appeal after remand*, 537 F.2d 694 (2d Cir.1976), *cert. denied*, 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977) also relied upon by the defendant, is also plainly distinguishable in that, "[t]he essence of the Government's case against both appellants resides in the testimony of Leonard Torres," *id.* at 1358, and it was during the course of his testimony at trial, that he lied. Similarly, in *United States v. Stofsky*, 527 F.2d 237 (2d Cir.1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976), the government

*relied principally* on the testimony of one Jack Glasser who committed perjury at trial. Even if those vital distinctions were not enough to differentiate those cases from this one, the teachings of *Brady, Giglio, Agurs* and *Bagley* discussed above would compel the conclusion heretofore reached. The corroboration of the few lines of Gravano's testimony from the mouths of John Gotti and this defendant as captured on tape recordings of intercepted conversations and the extensive circumstantial evidence would also distinguish such cases as *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), *United States v. Seijo,* 514 F.2d 1357 (2d Cir.1975), and *United States v. Sperling,* 506 F.2d 1323 (2d Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975), "where the witness whose credibility was at issue supplied the only evidence linking the defendant(s) to the crime." *See United States v. Petrillo,* 821 F.2d 85, 90 (2d Cir.1987).

If I were more mindful of Francis Bacon's admonition that "an overspeaking judge is no well-tuned cymbal" [7] and wise enough to heed it, I would say no more. Being neither sufficiently wise nor obedient, I venture to make some additional observations. The vigorous and insistent assertions by the defendant of Gravano's perjury *qua* perjury in another case have neither been challenged nor otherwise commented upon to any extent. In calling attention to portions of the opinion in *United States v. Bortnovsky,* 879 F.2d 30, 33 (2d Cir.1989), it is not my intention to challenge or pass upon those assertions in any way. It is interesting to note, however, that in commenting upon a claim that the testimony of a government witness was "palpably false" because he failed to note the substance of that testimony in reports of his investigation or in earlier testimony, the court wrote:

> Powell's earlier silence provides an insufficient basis upon which to find that the later testimony was false. At most, Powell's testimony differed from, but did not contradict, what he said earlier. However, even if this testimony had conflicted directly with that given previously, the differ-

---

7. Francis Bacon, *Judicature* in *Essays* (J.M. Dent & Sons) 162–63 (1958).

ence alone would not constitute perjury. "Presentation of a witness who recants or contradicts his prior testimony is not to be confused with ... perjury." It was for the jury to decide whether or not to credit the witness. *United States v. Holladay*, 566 F.2d 1018, 1019 (5th Cir.) (per curiam), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). *See also United States v. Hemmer*, 729 F.2d 10, 17 (1st Cir.) (inconsistencies between witness's statements before grand jury and at trial do not warrant inference that government knowingly used false testimony), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *United States ex rel. Burnett v. Illinois*, 619 F.2d 668, 674 (7th Cir.) ("Contradictory testimony does not constitute perjury.") (footnote omitted), *cert. denied*, 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980).

*See also United States v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir.1992) (differences in recollection alone do not add up to perjury but present a credibility question for the jury); *United States v. Petrillo*, 821 F.2d 85, 89 (2d Cir.1987) ("Taken in context, we regard this testimony as, at worst, equivocal ... and not so misleading as to require corrective action by the government.").

■ In denying that it was insensitive to its constitutional obligations prescribed by *Brady*, the government argues that the defendant does not have a right to search through the government's files, *Bagley*, 473 U.S. at 675, 105 S.Ct. at 3379, and that evidence is not suppressed when the defendant knew or should have known the essential facts that would permit critical scrutiny of a witness's testimony. *United States v. Zackson*, 6 F.3d 911 (2d Cir.1993); *United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir.) (the government is not required to draw inferences from evidence which defense counsel is in an equal position to draw), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

In this regard, the defendant had access to, and in fact had, Gravano's prior testimony in *United States v. Gotti; United States v. Pape*, Docket No. 92–CR–0159, EDNY, Feb. 1992; *United States v. Orena*, Docket No. 92–CR–0351, EDNY, Apr. 1992. In each of those cases, he was cross-examined about the involvement of John Gotti and the Gambino Organized Crime Family in drugs. In each he testified that the Gambino Family and John Gotti were against drugs. He also testified that there were, however, crews within the Gambino Family nevertheless involved in drug trafficking. It was surely known to the defendant that members of John Gotti's crew, namely, Angelo Ruggiero, Gene Gotti, and John Carniglia were convicted of drug trafficking in this district. (*See* Exhibit C, Def's. Mem.)

In this case, Gravano was cross-examined very skillfully concerning the period of time during which John Gotti was incarcerated and he, Gravano, either alone or with two others, ran the Gambino Family. The thrust of this examination was to establish that as the *de facto* head of the Family, Gravano was aware of all of its activities and having no knowledge of the involvement of the defendants in the crimes charged, they therefore hadn't any. For example:

Q. Am I correct to say that you were the closest person in this operation in the years 1988, '89, 1990 to John Gotti?

A. I would say so. I was the underboss, second in command.

Q. He made you the underboss, isn't that so?

A. Yes.

 * * * * * *

Q. Now, sir, there came a point in time when John Gotti was remanded to a jail, i.e., that is, the period May 1986 to April 1987, right?

A. Yes.

Q. And then there was left to this family the business of conducting its business, correct?

A. Yes.

 * * * * * *

Q. And during that period of time you were the acting street boss of this family, were you not?

A. That's what I was called.

 \* \* \* \* \* \*

Q. Is it fair to say that during this period of time you were the person who was in charge of the family, i.e., May '86 to April '87, agreed?

A. Other than John, I guess I was the last word, yes.

Q. But John Gotti was in jail; isn't that right?

A. Yes.

Q. Is it fair, then, to say, considering the people on the street, you were the man in charge of the family while Mr. Gotti was in prison, correct?

A. Yes.

 \* \* \* \* \* \*

Q. It is part of this group's business and function to not only provide a social club, but also to make money for its members in the administration; isn't that a fair statement?

A. You got it.

Q. If I got it, then I say to you, sir, during the period of time that you ran this family, the man in charge, am I correct, when I say neither John Gotti nor any single person ever said to you that Joe Gambino or Tom Gambino was responsible, was assigned the responsibility of bringing money from Connecticut gambling and Connecticut money lending, correct, Mr. Granvano?

A. Not to me, no.

 \* \* \* \* \* \*

Q. I am correct, am I not, that in your function as underboss, that you had frequent discussions with Mr. Gotti relative to money-making situations; isn't that a fair statement?

A. Social situations.

Q. All right. In other words, when you met with Gotti, you talked about social situations as well as business, the business of this Gambino organized crime family, La Cosa Nostra, correct?

A. Both, yes.

Q. You talked about the various ways that money is generated and made because after all that's its function in part, is it not?

A. Yes, but not necessarily the amounts of money.

 \* \* \* \* \* \*

Q. You are a part of the administration, the family, in early '86, until you go to prison on December 11, 1990, some four years or more?

A. Yes.

Q. Correct. During that time you cannot say to this jury, as you look upon them, that John Gotti ever said that Joe Gambino was bringing in or responsible for money from Connecticut gambling and loansharking, correct?

A. Yes.

Q. I am correct?

A. Yes, you are correct.

Q. And do I take it that during the four-year period that you sat at the top of this organization, there were many times that you talked about money and the amount of money that was coming in from the various ventures of this family; isn't that so?

A. We talked about money, but not the amount of money.

Q. You talked about money, right. You talked about people?

A. Yes.

Q. You talked about people who were connected to the money. Is that right?

A. In some cases, yes.

Tr. at 677–85.

It may be inferred in the light of that cross-examination that the defendant knew or should have known of Gravano's possible connection to drug trafficking. It may also be inferred, given the substantial video depictions of the association between Gravano and the defendant, that to apprise the jury of that aspect of Gravano's background would result in spillover prejudice to the defendant which they would have wished to avoid. *See, e.g., United States v. Provenzano*, 615 F.2d 37, 49 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980).

The defendant also bases his motion for a new trial upon the failure of the government to produce the notes of FBI Special Agent Carmine Russo of an interview on March 10, 1993 of Salvatore Gravano. Also present at that interview were Assistant United States Attorneys John Gleeson and Andrew Weissmann. It is his view that production of those notes was required by the Jencks Act. The notes are these:

3/10/93

SG/W Gleeson/Weissmann

Pat Conte "capo" big earner w/ Paul C gave Paul C car ME/BE (poss)—gift, drugs Conte John Gambino

C not bringing money into Family JG asked SG to speak to Pat C—off the record if he was dealing drugs Not—mafia war in C would send "Cheech" to Sicily contact SG not know if contact re-est. arrested—JG & Loc

Photos: old man, checked shirt cousin related to Loc in PC's crew made

2. Pat Conte

3. Paul G

4. Cheech "made" Pat's "crew" before JG boss—went to Sicily

5. young man—car Conte's son not made—

They work have jobs

The Jencks Act requires the government to produce any statement of the witness in its possession which relates to the subject matter as to which the witness testified.

The Act defines a "statement" as

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement[.]

\* \* \* \* \* \*

18 U.S.C. § 3500(e).

■ The initial inquiry is whether the notes of Special Agent Russo contain a "statement" of the witness within the mean-ing of the Jencks Act. The notes in question are not encompassed by the first clause of the Jencks Act which requires the statement to be written by the witness and signed or otherwise adopted or approved by him. The second clause does not require that the statement be signed or approved by the witness. What is required, however, is that it be a ."substantially verbatim" statement by him.

It is clear from the continuous congressional emphasis on 'substantially verbatim recital,' . . . that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation. We think it consistent with this legislative history, and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions.

*Palermo v. United States*, 360 U.S. 343, 352–53, 79 S.Ct. 1217, 1224–25, 3 L.Ed.2d 1287 (1959) (emphasis added). Had there been any doubt as to whether production of the Russo notes was compelled by the Jencks Act, the correct procedure would have been to submit the˚ notes to the trial judge for an *in camera* determination. *Palermo*, 360 U.S. at 354, 79 S.Ct. at 1225.

■ The government did not produce the Russo notes, nor were they submitted for an *in camera* determination. The teaching of *Palermo* and the standard it prescribed did not require the government to do either. Had the government entertained a doubt regarding production and presented the notes to this court for an *in camera* determination, production would unquestionably not have been required. The notes clearly do not reflect the kind of factual narrative contemplated by the Jencks Act and fall far short of the *Palermo* standard. *See also Hanks v. United States*, 388 F.2d 171 (10th Cir.)

(Jencks Act does not compel the indiscriminating production of agent's summaries of interviews regardless of their character or completeness), *cert. denied*, 393 U.S. 863, 89 S.Ct. 144, 21 L.Ed.2d 131 (1968); *United States v. Merida*, 765 F.2d 1205 (5th Cir. 1985) (Jencks Act does not require government to release to defense copies of witness interview reports prepared by agents of Drug Enforcement Administration which were short, concise, summaries of witness' version of the facts as recounted to agents, and in which summarization and not verbatim recital was manifest).

■ Even if the Russo notes satisfied the "statement" requirement of the Act, production would not be required for the reason that the statement does not relate to the subject matter as to which the witness testified. In *United States v. Pacelli*, 491 F.2d 1108 (2d Cir.), the court wrote, at page 1118:

> Under the Jencks Act a defendant in a federal criminal trial is entitled, after a government witness has testified on direct examination, to receive for purposes of cross-examination any "statement" of the witness in the government's possession "which relates to the subject matter as to which the witness has testified." ... We have held that the statement must at least "relate generally to the events and activities testified to" before the statement must be produced, *United States v. Cardillo*, 316 F.2d 606, 615 (2d Cir.), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963), and that the defense is not entitled to statements which are merely "incidental or collateral." *United States v. Birnbaum*, 337 F.2d 490 (2d Cir.1964).

*Cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974). The court recognized that the reasoning of *Cardillo* might be too restrictive and that a statement that would support impeachment for bias or interest may relate to the witness's testimony, it also recognized "that not all statements that might in some way be helpful in impeaching the witness are producible." *Birnbaum*, 337 F.2d at 498.

■ Assuming that the Russo notes were not encompassed by the Jencks Act for the reasons given, but were encompassed by *Brady, et al.*, the previous discussion of the legal consequences that flow from a failure to produce such material would nevertheless lead to the same conclusion, that is, the defendant's motion for a new trial must be denied.

After oral argument on the motion was heard on August 24, 1993 and at which time the court said there would be no further submissions (Tr. at 71), the defendant continued to submit letters to which additional materials were attached in further pursuit of his Rule 33 motion. The first such letter, dated October 6, 1993, states that Michael Rosen, counsel for the defendant, representing a defendant in another case (*United States v. Crea, et al.*, 93–CR–506 (E.D.N.Y.) (SJ)) was furnished a wiretap application dated May, 1989, seeking court authorized interceptions of communications at Salvatore Gravano's business office on Stillwell Avenue in Brooklyn. The affidavit of Kings County Assistant District Attorney Brian Mich in support of that application stated that the electronic surveillance was part of an investigation being conducted by state law enforcement officials and "Agents of the Federal Bureau of Investigation." That application recounts a conversation on March 17, 1989 captured on tape in which Gravano discusses how a witness subpoenaed to appear before a Grand Jury should testify so as to avoid being prosecuted for perjury or obstruction of justice. The defendant contends that the prosecution was obligated to turn over all *Brady* material uncovered in that investigation. He relies on this statement in *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972): "The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed for these purposes to the Government. *See* Restatement (Second) of Agency § 272."

In a letter response dated October 18, 1993, to which an affidavit of Assistant United States Attorney for the Eastern District Laura A. Ward was attached, she swore that "neither the prosecutors in this case nor the other prosecutors in this Office who have worked on related cases were aware of A.D.A. Mich's statement (or the Gravano

statement that it recounts) until we received Mr. Burstein's letter." Her affidavit goes on to recite facts pertaining to that wiretap application and the extent of the knowledge her office had. Her subsequent affidavit, dated October 25, 1993, provides even greater detail in that regard.

On October 19, 1993 another letter was received from Michael Rosen, counsel for the defendant, to which were attached three affidavits dated May 5, 1989 and June 8, 1989, respectively: one by Kings County Assistant District Attorney Brian Mich; one by Detective Matthew O'Brien assigned to the Kings County District Attorney's Squad; and one by Kings County Assistant District Attorney Lynn S. Olinger, all in support of an Eavesdropping Warrant requested to be issued by a Justice of the Supreme Court of the State of New York authorizing the interception of communications at the Stillwell Avenue premises. Once again, the defendant urges a *Brady* violation by the government, citing *Giglio, Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), and *Wedra v. Thomas*, 671 F.2d 713 (2d Cir.), *cert. denied*, 458 U.S. 1109, 102 S.Ct. 3491, 73 L.Ed.2d 1372 (1982).

On October 25, 1993, counsel for the defendant orally requested an "emergency" meeting with the court. A telephone conference was held shortly thereafter in which the government and defense counsel participated. Immediately prior to that conference, the court was furnished with a copy of an Affirmation in Opposition to a Motion to Bar Retrial, submitted by James B. Comey, a Special Assistant United States Attorney for the Southern District of New York. Various exhibits referred to in that affirmation were not attached and therefore not before the court. The Affirmation was in opposition to a motion made by the defendants in *United States v. Gambino, et al.*, (9S) 88–CR–919 (PKL) in the Southern District of New York. The defendants in that case base their motion on the claim that the Southern District withheld information contained in a letter proffered by the government in the Eastern District in the unrelated case of *United States v. Conte* (CR–93–0085) (ILG) pertaining to the bail status of Conte. The bulk of that affirmation addresses communications between the offices of the United States Attorney for the Southern and Eastern Districts of New York; whether the information exchanged between those offices did or did not make manifest Gravano's discussions with Conte about heroin trafficking and therefore, Gravano's involvement with it; whether the Southern District knew or should have known of that involvement; and whether certain information was or was not *Brady* material.

 The letters of October 6th and 19th will be addressed first. Each is predicated upon the assertion that knowledge of one agent of the Federal Bureau of Investigation working with Assistant District Attorneys of Kings County on another investigation four years ago and knowledge of those Assistant District Attorneys reflected in wiretap applications to a state judge should be imputed to the Assistant United States Attorneys in this case. That assertion is not persuasive. The three cases upon which the defendant relies will be examined briefly. *United States v. Giglio, supra*, involved a promise of leniency made to the key government witness by one Assistant United States Attorney which was not known to another in the same office. The Court held that the *"promise* made by one attorney must be attributed, *for these purposes*, to the Government." 405 U.S. at 154, 92 S.Ct. at 766 (emphasis added.) [8]

---

**8.** The Court cited in support of that holding The Restatement (Second) of Agency § 272. That Section provides as follows:

§ 272. GENERAL RULE

In accordance with and subject to the rules stated in this Topic, the liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information.

The comments to this section can leave no doubt that the applicability of the general rule has significance for the law of contracts, torts and property. Insofar as the promise made by the Assistant United States Attorney was relied upon by the key government witness in *Giglio*, a contract may be said to have been formed and this Rule was fairly applied. In the context of the facts before the court on this defendant's submission, the applicability of the Rule is extremely doubtful, to say the least, assuming that the Rule was ever contemplated to be applicable

*Santobello* involved a plea agreement made by one prosecutor which was specifically enforceable against another. In that context, the Court wrote "[t]he *staff lawyers* in a prosecutor's office have the burden of 'letting the left hand know what the right hand is doing' or has done." *Santobello*, 404 U.S. at 262, 92 S.Ct. at 499 (emphasis added).[9] *Wedra* is inapposite.

To apply *Giglio* to impute the knowledge of an FBI agent and state district attorney to the federal prosecutors in an unrelated case four years later "would appear to stretch the doctrine too far." *See United States v. Rosner*, 516 F.2d 269, 278–79 n. 4 (2d Cir.1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). That imputation presupposes a monolithic view of government which, if adopted, would condemn the prosecution of criminal cases to a state of paralysis. It is undoubtedly accurate to say that investigations of the members and associates of the Gambino Organized Crime Family by many federal and state law enforcement agencies have produced countless hours of surveillance logs and countless hours of video tapes and audio cassettes. Indeed, in the letter of October 6, 1993 previously referred to, defense counsel states his "understanding that the Stillwell Avenue surveillance alone consists of 858 cassettes." In the letter of October 19, 1993 defense counsel writes, "[t]here are still at least 800 tapes to be reviewed to see whether additional *Brady* material was captured and withheld." Those number estimates pertain to the surveillance of just one location.

To require the prosecutor to listen to every audio cassette, view every video tape and examine every surveillance log of the Gambino Organized Crime Family whenever and by whoever conducted to uncover the possible existence of *Brady* material is neither good logic nor good law and could not have been intended by *Giglio*. The untenability of that contention was most forcefully and convincingly conveyed in *United States v. Quinn,* as follows:

> ... [A]ppellants take the completely untenable position that "knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor" and that "he [the New York prosecutor] must be deemed to have had constructive knowledge of this evidence." ... The Department of Justice alone has thousands of employees in the fifty States of the Union. Add to these many more thousands of employees of "any part of the government." Appellants' argument can be disposed of on a "reductio ad absurdum" basis.

445 F.2d 940, 944 (2d Cir.), *cert. denied,* 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971). *See also United States v. Stassi,* 544 F.2d 579, 582 (2d Cir.1976), *cert. denied,* 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977) and *United States v. Morell,* 524 F.2d 550, 555 (2d Cir.1975).

Gravano was vigorously cross-examined about his role in obstructing justice. He admitted bribing jurors with a view towards frustrating the successful prosecution of Gambino Organized Crime Family Members, John Gotti and Eddie Lino. Gravano's past intercepted conversation pertaining to testimony before a grand jury was, by comparison, insignificantly cumulative.

The affirmation of James B. Comey is, in the final analysis, irrelevant to the determination of this motion. It adds nothing to the factual and legal calculus upon which the determination of this motion is based and which has been discussed at some length. Given the emphasis placed upon the conduct of the prosecutors and the recriminations between the Southern and Eastern District Offices of the United States Attorney which one may intuit from the Comey affirmation, it is worth repeating that the constitutional obligation of disclosure is not hinged upon the moral culpability of the

to criminal investigations which, I venture to say is also extremely doubtful.

The observation of the Court in *Santobello* confirms the contract analogy, viz.: "... [w]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello,* 404 U.S. at 262, 92 S.Ct. at 499.

**9.** *See* n. 8, *supra.*

prosecutor. If non-disclosure results in constitutional error "it is because of the character of the evidence, not the character of the prosecutor." *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). By adverting to that observation, I do not suggest that the prosecutors in this case were morally culpable and for the reasons previously discussed, I reiterate my conclusion that the character of the evidence did not result in constitutional error by its non-disclosure.

 Finally, the defendant's motion for a new trial based upon his assertion that the verdict was against the weight of the evidence is totally devoid of merit. The review of the evidence, set out at length in the first portion of this opinion, would permit no other conclusion.

For the foregoing reasons, the motions are denied.

SO ORDERED.